## State of Vermont v. Aime LaBounty

[716 A.2d 1]

No. 96-180

Present: **Dooley, Morse, Johnson and Skoglund, JJ., and Allen, C.J. (Ret.), Specially Assigned**

Opinion Filed April 17, 1998

Motion for Reargument Denied June 29, 1998

---

*William H. Sorrell*, Attorney General, *David Tartter*, Assistant Attorney General, and *Laurie LeClair*, Special Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

*Charles S. Martin* and *Reggie Oh*, Law Clerk (On the Brief), of *Martin & Associates*, Barre, for Defendant-Appellant.

**Morse, J.** Defendant Aime LaBounty appeals his conviction of aggravated sexual assault against two preschool girls in violation of 13 V.S.A. § 3253(a)(8). He contends the trial court erred by (1) denying his motion for severance; (2) admitting the victims' hearsay statements under V.R.E. 804a; (3) permitting the introduction of taped-recorded interviews of the victims; (4) not granting a mistrial based upon the prosecutor's improper questioning of a witness; (5) excluding an expert witness's testimony concerning sexual offenders; (6) denying a motion for acquittal based upon insufficient evidence; and (7) relying upon evidence of a prior uncharged sexual offense at sentencing. We affirm.

Defendant's wife, Lucy LaBounty, operated a day-care facility out of the home she shared with defendant in St. Johnsbury. One day in February 1995, Mrs. LaBounty left the daycare from 12:30 to 3:00 p.m. to deliver a cake to a "Home Dem" meeting, leaving four-year-old B.M. and two other children in the care of defendant. Later that day, when B.M.'s mother Allison Bean picked her up, B.M. immediately exclaimed, "Mommy, don't tell my daddy or I'll never see him again." When Ms. Bean asked what she meant, B.M. explained, "I sucked [defendant's] peepee today." On further questioning the child elaborated as follows: "[H]e put it in my throat and it choked me and it hurt me." Ms. Bean asked B.M. where Lucy LaBounty was at the time. She responded that Mrs. LaBounty was taking a cake to a friend's house. B.M. also disclosed that defendant had told her not to tell, or she would never see her father again.

Ms. Bean immediately took B.M to the house of a friend, Diane Bashaw. B.M. recounted the same story she had told her mother, adding that the incident had occurred on the couch in the living room of defendant's house. Later that evening, Ms. Bean related B.M.'s disclosures to her friend, Tammy Jones, whose four-year-old daughter S.J. had attended the LaBounty's daycare between May and October of 1994. Alarmed, Ms. Jones asked S.J. whether defendant had ever showed her his "peepee." She replied "no," then immediately stated, "he made me suck it." S.J. told her mother that the other children were outside at the time of the incident, and that defendant had kept her inside because he didn't want her to catch a cold. She explained that she had not said anything earlier because defendant told her not to. The following morning, S.J. came into her mother's bedroom and told her that "yucky stuff" from defendant's peepee had "come out in her mouth." Her mother had not asked S.J. any questions before this disclosure.

The following day, B.M. was interviewed by an investigator for the Department of Social and Rehabilitation Services, Fran Neville, and an investigator for the State Police, Robert Van Damm. B.M. recounted the same events to the investigators that she had spontaneously told her mother the day before, explaining that defendant had "stuffed his whole peepee" in her mouth. She recounted where the incident had occurred and where Lucy and the other children were at the time. She also described the color of defendant's clothes at the time of the incident. She denied that he had removed any of his clothes, but volunteered that he had "unzipped his pants."

S.J. was also interviewed by an SRS caseworker, Katherine Bergeron, along with officer Van Damm. Although hesitant and unresponsive to many of their initial questions, S.J. ultimately repeated the story she had earlier told her mother, adding that the incident had occurred in the LaBounty's bathroom, and that defendant had wiped the "yucky stuff" off with his shirt.

Mrs. LaBounty testified that she regularly left the children in defendant's care when she went to meetings or appointments, and confirmed that she had left the house to deliver a cake at the time of the incident involving B.M. Defendant also testified, acknowledging that he was with B.M. on the date in question, and that he had spent part of the time on the couch, with B.M.'s head on his lap while she slept.

Defendant was charged with two counts of aggravated sexual assault against B.M and S.J., in violation of 13 V.S.A. § 3253(a)(8).

His first trial ended in a mistrial. Upon retrial, he was found guilty by a jury of both counts and sentenced to two consecutive terms of five to twenty-five years, with all but 90 days of the sentence on the second count suspended. This appeal followed.

## I.

Before trial, defendant moved to sever the charged offenses, arguing: (1) that he was entitled to severance as a matter of right under V.R.Cr.P. 14(b)(1)(A), and (2) that severance was necessary as a discretionary matter to achieve a "fair determination" of his guilt or innocence under V.R.Cr.P. 14(b)(1)(B). The trial court denied the motion. Defendant thereafter reasserted the motion at the close of the evidence as required by V.R.Cr.P. 14(b)(4)(C). It was again denied. He renews both claims on appeal.

Two or more offenses may be joined for trial when the offenses "(1) are of the same or similar character, even if not part of a single scheme or plan; or (2) are based on the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan." V.R.Cr.P. 8(a). When the offenses have been joined solely on the ground that they are of the same or similar character, the defendant is entitled to severance as a matter of right under V.R.Cr.P. 14(b)(1)(A). *State v. Carter*, 156 Vt. 437, 440, 593 A.2d 88, 91 (1991). When the joined offenses represent a series of acts constituting parts of a single scheme or plan, the right to severance is not absolute, but turns upon a showing that severance is necessary to "achieve a fair determination" of guilt or innocence. V.R.Cr.P. 14(b)(1)(B); see *State v. Johnson*, 158 Vt. 344, 351, 612 A.2d 1114, 1118 (1992).

Defendant was not entitled to severance as a matter of right because the charged offenses were properly joined as "acts . . . constituting parts of a single scheme or plan." V.R.Cr.P. 8(a)(2). Although separated by a period of months, the assaults evinced a common objective, plan, and method. Each of the assaults was upon a victim of tender years attending the same day-care center; each was made possible by defendant's exploiting his position of trust at the center; each occurred at the day-care center when defendant's wife was not on the premises and defendant was assured of privacy; each was followed by a warning to the child not to tell; and each appeared to follow a common pattern of defendant forcing his penis into the victim's mouth without prelude or warning, and with little or no discussion.

As the trial court observed, the similarities between this case and *Johnson* "are striking." There, as here, the defendant was accused of taking advantage of a position of trust (camp counselor) to sexually exploit several minors. There, as here, the "offenses were connected to each other in time and space, the profile of the victims, the relationship of the victims to defendant, and the opportunity presented to, and exploited by, defendant." *Johnson*, 158 Vt. at 351, 612 A.2d at 1118. Thus, we affirmed the trial court's refusal to sever the offenses under V.R.Cr.P. 14(b)(1)(A) as a matter of right, holding that they were "not only the same or similar in character but also . . . constitut[ed] parts of a single 'scheme or plan.'" *Id.*

Defendant notes that unlike *Johnson* the charged offenses here were separated in time by about four to nine months. We have held that "temporal proximity is a prerequisite to admission in plan or scheme cases" in the context of admitting evidence of prior bad acts under V.R.E. 404(b). *State v. Winter*, 162 Vt. 388, 396, 648 A.2d 624, 629 (1994). We have also observed that there is no "hard-and-fast" rule regarding time limits, and that "the necessary proximity must vary with the circumstances." *Id.* at 397, 648 A.2d at 629. Indeed, in *Johnson* we relied on *People v. Epps*, 176 Cal. Rptr. 332, 337-38 (Ct. App. 1981), which involved sexual assaults upon young victims that occurred seven months apart, and *State v. Tecca*, 714 P.2d 136, 138 (Mont. 1986), which concerned a series of sexual assaults against minors over a period of several years. See *Johnson*, 158 Vt. at 352-53, 612 A.2d at 1119. Moreover, we have recognized that a lapse of time between offenses may occur simply because "a defendant has lacked the opportunity to put a plan into effect." *Winter*, 162 Vt. at 397, 648 A.2d at 629. That appears to have been the case here. The first victim left the day-care center in October 1994 and thus became unavailable to defendant; several months later, he assaulted another child in the same place, in the same manner, followed by the same warning. We thus conclude that the trial court correctly denied the motion for severance as a matter of right.

We also reject defendant's claim that the trial court erred in refusing to sever the offenses as necessary to assure a "fair determination" of guilt or innocence under V.R.Cr.P. 14(b)(1)(B). It is the defendant's burden to demonstrate that severance is necessary under V.R.Cr.P. 14(b)(1)(B) "by 'substantial evidence of prejudice.'" *State v. Venman*, 151 Vt. 561, 567, 564 A.2d 574, 579 (1989) (quoting *State v. Richards*, 144 Vt. 16, 19, 470 A.2d 1187, 1189 (1983)). The decision is committed to the sound discretion of the trial court. *State v. Chenette*, 151 Vt. 237, 243, 560 A.2d 365, 370 (1989).

We note at the outset that although defendant renewed the motion at the close of the evidence, which is required under V.R.Cr.P. 14(b)(4)(C) to avoid a waiver, he made no effort "'to show that the potential prejudice which his pre-trial motion claimed ha[d] actually occurred.'" *Venman*, 151 Vt. at 566-67, 564 A.2d at 578 (quoting Reporter's Notes to V.R.Cr.P. 14). In renewing the motion, defense counsel indicated that her sole purpose was to preserve the issue; she cited no evidence and made no argument in support of the motion. As we explained in *Venman*, the requirement that a motion for severance be renewed at the close of evidence was placed in the rule to give the defendant, and the trial court, the opportunity to reconsider the potential prejudice resulting from joinder "when the relevant facts are known." *Id.* at 566, 564 A.2d at 578. "'By placing the burden upon the defendant to renew the motion, the standard permits the defendant to reevaluate the issue of prejudice and to elect to proceed with a consolidated trial despite the risk of prejudice. Therefore, failure to renew the motion constitutes a waiver of any right to severance.'" *Id.* at 567, 564 A.2d at 578 (quoting American Bar Association, Standards for Criminal Justice § 13-3.3(c), Commentary at 13.41 (2d ed. 1988)).

Even assuming that the issue was properly preserved, however, we do not find that the denial of a severance resulted in any prejudice to defendant at trial. Evidence relating to both offenses would have been admissible in separate trials to show a common scheme or plan under V.R.E. 404(b). See *State v. Beshaw*, 136 Vt. 311, 313, 388 A.2d 381, 382 (1978) (severance denied where identical evidence would have been before jury in any event). As previously discussed, the offenses revealed a common objective, plan, and method. Therefore, as we explained in *Johnson*, "the common features of defendant's conduct, the settings, and the victims, would have permitted admission of the evidence under 404(b)." 158 Vt. at 352, 612 A.2d at 1119. We note further that joinder did not inhibit defendant from testifying with regard to either of the charged offenses. See *id.* at 353, 612 A.2d at 1119 (no "undue prejudice" where defendant made no claim that "joinder infringed upon his right to testify with regard to one or more of the offenses"). We thus conclude that the trial court acted within its discretion in denying defendant's motion for severance under V.R.Cr.P. 14(b)(1)(b).

## II.

Defendant next contends the trial court erred in admitting a variety of hearsay testimony under V.R.E. 804a. That rule allows a

witness to testify to hearsay statements made by a child ten years old or younger if the statements are offered in a sexual assault case where the child is an alleged victim, the statements were not taken in preparation for a legal proceeding, the child is available to testify, and the circumstances surrounding the statements show they are trustworthy. V.R.E. 804a(a); *State v. Fisher*, 167 Vt. 36, 39, 702 A.2d 41, 43 (1997). The trial court enjoys "great discretion in admitting or excluding evidence under the rule, and we will not reverse such decisions unless there has been an abuse of discretion resulting in prejudice." *Id.*

*Statements to Victims' Parents*

Defendant first challenges the court's finding that the victims' statements to their parents were trustworthy. The sole basis of the claim is the trial court's observation that "the statements provide circumstances which are largely similar. They interlock in some respects." Defendant contends it was error to use the statements to "cross-corroborate each other." See *Idaho v. Wright*, 497 U.S. 805, 822-24 (1990) (hearsay evidence used to convict must possess inherent indicia of reliability, not gain it by reference to other evidence).

Although the court referred to the similarity of the statements, the bulk of its analysis focused on other factors including their freshness, spontaneity, internal consistency, and accuracy with respect to surrounding detail. As the court explained, "the timing, the content and the circumstances of the statements provide strong indicia of trustworthiness. . . . [T]here was much precision in the statements . . ., much detail and they were fresh." As we observed in *State v. Lawton*, 164 Vt. 179, 190, 667 A.2d 50, 59 (1995), "[w]e do not deem mere mention of corroboration clearly erroneous."

*Statements to SRS and Police*

Defendant also contends that the court erred in admitting the victims' subsequent statements to the SRS investigators and the State Police officer. He argues that the statements were inadmissible under 804a on the grounds that they: (1) were made in preparation for a legal proceeding, and (2) lacked sufficient indicia of trustworthiness.

Statements to social workers and the police are not necessarily in preparation for a legal proceeding. Indeed, as we observed in *Fisher*, statements taken by SRS investigators are generally "not to make a case against the accused, but to ascertain the reliability of the accusations so the child can, if necessary, be protected." 167 Vt. at 42, 702 A.2d at 45. Similarly, statements taken by police officers "are often investigatory" in nature. *Id.* Thus, we have often determined

that joint preliminary interviews by SRS and police investigators were taken primarily for purposes of investigation and protection rather than in preparation for legal proceedings. See, e.g., *Fisher*, 167 Vt. at 42, 702 A.2d at 45 (interview by SRS investigator and Brattleboro police officer was investigatory in nature and thus childrens' statements were admissible under 804a); *State v. Blackburn*, 162 Vt. 21, 24-26, 643 A.2d 224, 225-26 (1993) (hearsay statements to SRS caseworker and police officer were taken for purposes of investigation, not for preparation of legal action); *State v. Duffy*, 158 Vt. 170, 172-73, 605 A.2d 533, 535 (1992) (statement to SRS investigator with police detective present was primarily for investigation, not to make a case against the accused).

The fact that statements are recorded and may subsequently be used in legal proceedings does not change their initial character as investigatory. *Duffy*, 158 Vt. at 172, 605 A.2d at 535. The fundamental question is whether, viewed objectively in the light of the totality of the circumstances, the statements were gathered primarily to prepare a legal action against the accused, or primarily to investigate the allegations. *Fisher*, 167 Vt. at 42, 702 A.2d at 45.

The trial court's finding that the statements were not taken in preparation for legal proceedings was amply supported by the record. Both interviews were conducted the day after the children made their initial disclosures. The State Police investigator testified that it was his practice to attend SRS interviews so that the children were not compelled to give the same statement twice. Thus, the timing and circumstances of the interviews support the conclusion that their purpose was to investigate the allegations and determine the need for intervention, not to prepare a criminal prosecution against defendant. See *id.* at 42, 702 A.2d at 45 (interview with SRS investigator and police "within a week" of initial disclosures deemed investigatory in nature); *Blackburn*, 162 Vt. at 25, 643 A.2d at 226 (interview with police after four preliminary SRS interviews still within "the investigatory stage"); *In re M.B.*, 158 Vt. 63, 68, 605 A.2d 515, 518 (1992) (three SRS interviews, two with police officers present, were conducted for investigatory purposes). The trial court did not abuse its discretion in finding that the interviews had not been taken in preparation for legal proceedings.

■ Defendant also contends that the statements lacked sufficient indicia of trustworthiness. As noted, both SRS interviews with the children were tape recorded and transcribed. Having reviewed both tapes, the trial court found that they demonstrated ample indicia of

reliability. We agree. Neither of the SRS interviewers had been informed of the details of the alleged abuse prior to the interviews, so neither was seeking to confirm any preconceived ideas of what the children should be disclosing. The childrens' statements were fresh, having occurred the day after their initial disclosures. Each child stated that defendant had put his "peepee" in her mouth, and S.J. provided additional details about the assault. Each child provided accurate information concerning peripheral details, such as defendant's appearance and clothing on the date of the incident, the interior of the house, Lucy LaBounty's activities on the day in question, and the rooms where the abuse allegedly occurred. The timing and conduct of the interviews, and the overall consistency and detail of the childrens' statements, thus support the trial court's finding of trustworthiness. See *State v. Gallagher*, 150 Vt. 341, 348, 554 A.2d 221, 225, *cert. denied*, 488 U.S. 995 (1988) (enumerating various factors court may consider in evaluating veracity of child's statement).

Although defendant cites several seemingly contradictory responses by B.M. during the interview, our independent review of the record supports the trial court's finding as to the overall consistency and reliability of her statement. Defendant also challenges the reliability of S.J.'s statement, asserting that it contained no specific details, that the SRS interviewer pursued a "preconceived notion" that S.J. had been abused and employed improper leading questions, and that S.J.'s mother improperly influenced her daughter's answers. Although S.J.'s interviewer acknowledged that she was relatively inexperienced at conducting such interviews, and S.J. was hesitant and frequently nonresponsive throughout the interview, we perceive no likelihood that S.J.'s allegations were the product of undue coercion or suggestion. Through direct and occasionally whispered responses to the SRS interviewer, who then repeated her answers, S.J. recalled defendant's appearance, the location of the other children during the incident, and the room where the abuse occurred. She expressly reaffirmed her earlier spontaneous disclosure to her mother that defendant had put his "peepee" in her mouth, that he had made her "suck on it," and that "yucky stuff [had] come out." She further volunteered that the discharge went into her mouth, and that defendant had wiped it off with his shirt. We are thus satisfied that the trial court's finding as to the overall trustworthiness of the statement was not "clearly erroneous." *Id.* at 348, 554 A.2d at 225.

### III.

■ Defendant next contends the trial court violated his confrontation rights by permitting the taped SRS interviews of B.M. and S.J. to be played to the jury shortly after defendant had commenced his case-in-chief. Defendant claims that the timing of their admission somehow deprived him of the opportunity to confront and cross-examine the victims during the State's case. The record reveals, however, that the State sought to introduce the tapes during its case-in-chief through its last witness, officer Van Damm. Defense counsel thereupon objected on the grounds of relevance and authenticity, and the court deferred ruling, *without objection*, until after the State had rested and the defense case had commenced. Thereafter, the court offered defense counsel the option of having the State's case reopened to have the tapes admitted, or to admit them during the State's rebuttal; the court also reminded counsel of her right to have the victims called to testify for the State under V.R.E. 804a(b). Defense counsel declined all of these options. It is apparent, accordingly, that defendant waived any claim of error on appeal.

Defendant also asserts that the introduction of the tapes impermissibly bolstered the State's case and deprived him of a fair trial. The record shows, however, that defense counsel had attempted to impeach both the methods employed by the SRS investigators and their memories of the victims' statements. The trial court was thus justified in ruling that the tapes were relevant and admissible to show the actual content, tone, and dynamic of the interviews. See *id.* at 348-49, 554 A.2d at 225-26 (admission of hearsay testimony under 804a in addition to child declarant's own testimony was not unduly prejudicial or "prosecutorial overkill").

### IV.

■ Defendant's remaining four claims are also without merit. He contends that SRS investigator Bergeron impermissibly vouched for the credibility of S.J. See *State v. Gomes*, 162 Vt. 319, 328, 648 A.2d 396, 403 (1994) (expert's comment on truthfulness of complaining witness may lend "'improper aura of special reliability'") (quoting *State v. Catsam*, 148 Vt. 366, 371, 534 A.2d 184, 188 (1987)). On cross-examination, defense counsel had assailed the investigator for failing to determine whether S.J. knew the difference between a truth and a lie. On redirect, the State asked the witness if she had done anything "to satisfy yourself that what you were getting was the

truth." She replied, "Yes." Defense counsel immediately objected and moved for a mistrial. The court denied the motion but gave the jury a curative instruction. Although defendant contends otherwise, this was adequate to preclude any possible prejudice; the objectionable comment was brief, the witness's limited experience had been thoroughly explored on cross-examination, and the court's response was immediate and unequivocal. Hence, we cannot conclude the court abused its discretion in ruling that defendant had not been prejudiced. See *Johnson*, 158 Vt. at 349, 612 A.2d at 1117.

Defendant additionally contends that the court abused its discretion in excluding the testimony of an expert witness. The defense had proposed to call Dr. Richard Hamill, a clinical psychologist, to testify about his work in treating sex offenders. Dr. Hamill explained that he relied upon certain sex offender "profiles" to help "tailor treatment approaches" for convicted sex offenders and to assess the risks of recidivism; the profiles were not designed or used to determine whether the individual had committed the offense. Dr. Hamill described a profile developed for offenders known as "acquaintance" abusers, i.e., offenders who knew their victims. According to this typology, child abuse typically progresses through five "stages"; first, the offender attempts to persuade the victim that sexual activity is acceptable; second, the offender engages the victim in progressively intrusive sexual "interactions," starting with inappropriate touching and progressing to intercourse or oral sex; in the third, or "secrecy" phase, the offender attempts to persuade the victim to keep the sexual abuse secret; in the fourth, or "disclosure" phase, the sexual abuse is either purposefully or inadvertently disclosed; and in the final, or "suppression," stage the victim often attempts to recant the disclosure out of a sense of guilt. The trial court excluded the proferred testimony on the ground, among others, that its probative value was minimal and was substantially outweighed by its tendency to confuse the issues and mislead the jury. See V.R.E. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.").

The admissibility of expert evidence must be considered "in context with the general requirements of admissibility of relevant evidence contained in [V.]R.E. 402 and 403." *State v. Brooks*, 162 Vt. 26, 30, 643 A.2d 226, 229 (1993). The trial court is accorded broad discretion in balancing the factors in Rule 403, and its ruling will not be disturbed

by this Court absent a showing of an abuse of that discretion. See *State v. Webster*, 165 Vt. 54, 56, 675 A.2d 1330, 1332 (1996). Applying this standard, we cannot say that the court abused its discretion in excluding the proferred testimony. We have held, to be sure, that psychological "profile" evidence is admissible to "dispel misconceptions" about the behavior of *victims* of child sexual abuse. *State v. Gokey*, 154 Vt. 129, 133, 574 A.2d 766, 768 (1990). We have also permitted the prosecution to introduce statistical evidence that the incidence of mental illness among *child abusers* is no greater than the general population. See *State v. Valley*, 153 Vt. 380, 384-89, 571 A.2d. 579, 581-83 (1989). We stressed in *Valley*, however, that the evidence was offered to rebut a defense claim of insanity rather than to prove defendant's guilt by statistical probability or by association with other defendants. See *id.* at 387, 571 A.2d at 583; cf. *State v. Percy*, 146 Vt. 475, 484, 507 A.2d 955, 960 (1986) (evidence that rapists typically claim either consent or amnesia inadmissible as irrelevant to what defendant claimed).

We have not heretofore considered the admissibility of profile evidence concerning the so-called "acquaintance" sexual abuser, although other states have addressed the issue. Such evidence is generally offered by the prosecution to show that the defendant or the defendant's behavior matched a profile typical of such offenders. See McCord, *Syndromes, Profiles and Other Mental Exotica: A New Approach to the Admissibility of Nontraditional Psychological Evidence in Criminal Cases*, 66 Or. L. Rev. 19, 54-55 (1987). In cases where the prosecution has succeeded in having such evidence admitted, appellate courts have overwhelmingly disapproved its use. *Id.* at 55. In *State v. Braham*, 841 P.2d 785, 787 (Wash. Ct. App. 1992), for example, the trial court admitted expert testimony to establish that the defendant had engaged in some conduct consistent with "grooming," a clinical term for the process of victimization described by Dr. Hamill in this case. The court held that such evidence, "implying guilt based on the characteristics of known offenders is the sort of testimony deemed unduly prejudicial and therefore inadmissible." *Id.* at 789-90. Similarly, in *Hall v. State*, 692 S.W.2d 769, 770-71 (Ark. Ct. App. 1985), the trial court admitted expert evidence concerning the "psychological profile of a [child abuse] perpetrator" indicating that in a high percentage of cases the perpetrator is known to the victim, the offense occurs in the home of the child or perpetrator, the first offense is usually committed before the age of 40, and the child is told not to tell. The court of appeals ruled that the evidence was unduly

prejudicial and compelled reversal. See *id.* at 773. Other cases are to the same effect. See, e.g., *State v. Clements*, 770 P.2d 447, 453-54 (Kan. 1989) (evidence that defendant "fit the profile of the typical child sexual offender" was unduly prejudicial and required reversal); *State v. Petrich*, 683 P.2d 173, 180 (Wash. 1984) (potential for prejudice outweighed probative value of evidence that high percentage of child-abuse crimes are committed by someone child knew).

▪ Here, we are not confronted with the typical case in which the prosecution attempts to prove guilt by showing that the defendant's behavior matched a sex offender profile. Accordingly, we need not rule on the general admissibility of such evidence in those circumstances. In this case, the evidence was offered by defendant, apparently to buttress his claim of innocence by demonstrating that his behavior deviated in some respects from the norm. There had been no claim by the prosecution that defendant's behavior was consistent with the typical "acquaintance" offender, which defendant was merely attempting to rebut. Nor was there any claim by the defense that the evidence was necessary to assist the jury to "dispel misconceptions" about the behavior of perpetrators. *Gokey*, 154 Vt. at 133, 574 A.2d at 768. In these circumstances, we are satisfied that the court acted within its broad discretion in declining to open the issue. Had the evidence been admitted, for example, the prosecution could reasonably have adduced expert rebuttal evidence, and a side-trial could have ensued on whether and to what extent defendant's actions did or did not conform to the general profile. The distraction from the main issue of *defendant's* actions in this case, the limited probative value as to *defendant's* guilt or innocence, and the potential for jury confusion and undue delay all amply supported the trial court's discretionary ruling to exclude the evidence.

▪ Defendant next contends the evidence was insufficient to support the conviction, asserting that there was no independent corroboration of the victims' hearsay statements, and that the statements were not made in circumstances that were reliable. He relies primarily on *State v. Robar*, 157 Vt. 387, 395, 601 A.2d 1376, 1380 (1991), in which we held that the State could not meet its burden of proof if the sole evidence on which it relied was past recollection recorded or prior inconsistent statements, unless the statements met specific standards of reliability. Although we have not extended *Robar's* requirements to 804a hearsay statements, we need not address this issue, for as previously discussed the childrens' state-

ments were fully trustworthy and reliable. Viewing the evidence in the light most favorable to the State, and excluding modifying evidence, we conclude that the evidence fairly and reasonably supports a finding of guilt beyond a reasonable doubt. See *id.* at 391, 601 A.2d at 1378.

Finally, defendant asserts that the trial court improperly relied at sentencing on the testimony of defendant's adult daughter. The court sentenced defendant to two consecutive terms of five to twenty-five years, but suspended all of the sentence on the second count except for ninety days, which he served immediately. In imposing sentence, the court relied in part on the daughter's testimony, who stated that defendant had forced her to engage in oral sex when she was five years old, and had abused her again when she was twelve. She explained that she had not recalled the abuse until she was eighteen (she was thirty-one at the time of the hearing), at which time she wrote her father a letter urging him to seek treatment.

The evidence was plainly relevant to sentencing as it shed light on "the nature and propensities of the offender." *State v. Thompson*, 150 Vt. 640, 645, 556 A.2d 95, 99 (1989). Such evidence may include the testimony of other alleged victims. *State v. Drake*, 150 Vt. 235, 236, 552 A.2d 780, 781 (1988). Defendant was afforded the opportunity to cross-examine the witness, and could have testified in rebuttal with guaranteed immunity if he had so desired. See *id.* at 237, 552 A.2d at 781. Although defendant raises the specter of "recovered memory" testimony, that issue was never raised at the hearing, and no evidence on the subject was presented. We find no error.

*Affirmed.*