2012 VT 65

## State of Vermont v. Richard Reid

[59 A.3d 711]

No. 11-082

Present: **Reiber, C.J., Dooley, Skoglund, Burgess and Robinson, JJ.**

Opinion Filed August 10, 2012.

Motion for Reargument Denied October 2, 2012

*Christopher C. Moll*, Lamoille County Deputy State's Attorney, Hyde Park, for Plaintiff-Appellee.

*Allison N. Fulcher* of *Martin & Associates*, Barre, for Defendant-Appellant.

¶ 1. **Reiber, C.J.** Defendant Richard Reid appeals from his conviction for aggravated sexual assault in violation of 13 V.S.A. § 3253(a)(8). Defendant asserts that the trial court committed reversible error in admitting hearsay evidence under Vermont Rule of Evidence 804a because the State failed to establish that the time, content, and circumstances of the child-victim's statements provided substantial indicia of trustworthiness. We affirm.

¶ 2. In the summer of 2008, when she was six years old, the child, A.V., made statements to her neighbors indicating that defendant had sexually abused her. On August 26, a neighbor filed a report with the Vermont Department for Children and Families (DCF). The following day, a DCF investigator and a police officer went to A.V.'s school to question her about the alleged abuse. The investigators found that there was sufficient evidence that defendant had sexually abused A.V., and she was transported to the hospital for further examination. At the hospital, an experienced and trained Sexual Assault Nurse Examiner (SANE) questioned A.V. and conducted a brief physical examination. Defendant was charged with aggravated sexual assault on August 28. In October 2008, the State provided notice that it intended to offer into evidence hearsay statements made by A.V. through various witnesses pursuant to V.R.E. 804a. On November 19, 2009, pursuant to Rule 804a, the court held a pretrial hearing to determine the admissibility of the statements. The following evidence was presented at the hearing.

¶ 3. A.V. first disclosed the alleged sexual abuse by defendant to her friend and neighbor, Ariel. Ariel testified that during the summer of 2008, while riding bikes with A.V., A.V. told her that defendant "sticks it in her butt and in her mouth, and that the white stuff makes people stronger and that the white stuff gets inside her." She also testified that at one point she noticed a bruise on A.V.'s head. When she asked A.V. about it, A.V. told her

that it was from defendant "hitting her head off the headboard when she told him no."

¶ 4. Ariel's sister, Tammy, testified that A.V. had told her about the abuse while the three of them were sitting on the porch. A.V. said that if she told her mother, defendant would "give it to her even harder." Tammy noticed that A.V. looked scared and was almost crying. Tammy further testified that she remembered one instance when A.V. held her crotch while playing and complained that she was sore.

¶ 5. Leola, another one of A.V.'s neighbors, testified that A.V. often played with her daughter, and on several occasions, she took the girls to play at her mother's house. Leola stated that while at her mother's house A.V. ran around pulling on the crotch area of her pants. When A.V. was asked why, she said that defendant "had stuck his fingers in her too-too." Leola also testified that A.V. did not want to be home alone with defendant, and that she would "break down crying and screaming." Leola also testified that A.V. had been exposed to some of the neighbors' daughters fighting. The girls argued loudly in public and used graphic language that was sexual in nature. One of the girls taunted the other by accusing her of sleeping with her own father.

¶ 6. Leola's cousin, Christie, was the last of A.V.'s neighbors to testify at the hearing. Christie testified that Leola urged A.V. to tell Christie her "secret." A.V. seemed very upset and scared, and looked at the ground. A.V. disclosed that defendant had touched her and told her not to tell anyone. She said defendant "put it . . . in the back." She also stated that defendant put it in her vagina, for which she had a certain name, though Christie could not recall what it was. After, defendant gave A.V. candy or a popsicle. The following day, on August, 26, 2008, Christie filed a report with DCF.

¶ 7. A.V.'s mother testified that A.V. had previously complained that she was experiencing a burning sensation when she urinated. She took A.V. to the pediatrician who did not find any infection, but asked whether A.V. might have been abused or molested. At the time, A.V.'s mother did not suspect anything, and answered "no." There were no other physical or medical signs of abuse. A.V.'s mother also reported that she had previously noticed that A.V. had a bruise on her head. She asked A.V. about it, but A.V. was evasive, claiming she could not remember what had happened.

Defendant told A.V.'s mother that A.V. had been playing by the windowsill and had banged her head.

¶ 8. The DCF investigator testified that she and a police officer conducted an interview with A.V. at her school on August 27, 2008. The DCF investigator explained that she was not a principal investigator for DCF, but had attended a few training sessions on interviewing techniques for children. The court listened to the recording of the interview, and found the following.

¶ 9. The interview began around 10:30 a.m. and ended after the school day concluded. They took several breaks, including one for lunch. Before lunch, the investigators asked fairly general questions, mostly related to A.V. and her family, in order to allow A.V. to become comfortable with the interviewers. A.V. seemed "personable, engaging, and animated," but repeatedly asked to return to her classroom. When the interviewers asked about defendant, A.V. became more withdrawn and actively changed the subject to avoid talking about him. She appeared distracted and her responses were "flighty."

¶ 10. The investigators attempted to get A.V. to discuss defendant by prompting her in a number of ways. They asked her about what she told her neighbors, but A.V. remained evasive. They occasionally reminded A.V. that "it was good to tell the truth," but despite their efforts, A.V. continued to deny that she had been abused.

¶ 11. The morning interview lasted approximately an hour and a half. During lunch, the DCF investigator conferred with her district director, and the police officer spoke with A.V.'s neighbors. Both concluded that, given the specificity of the reports and others' statements that defendant had threatened A.V. so that she would not say anything, A.V. could be at risk of further abuse and therefore the interview should resume in the afternoon.

¶ 12. The interview with A.V. continued after lunch with "more pointed questions." The investigators told A.V. that they had spoken with her neighbors, they "knew something was going on at home," and again, they asked her "what she had told Ariel." A.V. became more uncomfortable. She put her head down and was hesitant to talk. She continued to ask if she could return to her classroom. Eventually, A.V. described being sexually assaulted by defendant. Specifically, A.V. described a purple bottle of oil that defendant kept by the bed and used to "lubricate" his "too too." She also stated that when she was five years old "it hurt worse"

and she "screamed." A.V. discussed particular instances of defendant's sexual abuse with graphic detail and stated that she was concerned that defendant would find out.

¶ 13. The interview concluded at the end of the school day. The investigators found that there was sufficient evidence that defendant had sexually abused A.V. and she was transported to the hospital for a medical examination, where her mother joined her. The SANE nurse questioned A.V. further and conducted a brief physical examination. Prior to the examination, the DCF investigator provided the nurse with a brief summary of A.V.'s statements from earlier in the day. At first, A.V. was reluctant to talk with the nurse, but eventually she became "pretty verbal and did not need a lot of prompting."

¶ 14. Defendant's expert, Dr. Mantel, testified at the 804a hearing on the issue of forensic interviewing methods. He testified that there are at least six well-developed protocols for forensically interviewing alleged child victims of sexual abuse, which contain five common elements: (1) rapport-building; (2) establishing and testing conversational ground rules; (3) competency examination; (4) the abuse inquiry, using nonleading questions and a nonconfirmatory structure; and (5) validation review, in which the interviewer reviews the evidentiary record to determine the possibility that the child gave a false positive or a false negative. He opined that the interview at the school was a failure because there was no phased structure, it was coercive and marked by confirmatory bias, the interviewers relied on leading or suggestive questions, and they failed to explore alternate explanations for A.V.'s statements. He also opined that the interview at the hospital was improper because the DCF investigator was present, she provided the SANE nurse with information which she used to formulate questions, and A.V.'s mother was present.

¶ 15. In a January 14, 2010 order, the trial court found that A.V.'s statements possessed sufficient indicia of trustworthiness. In particular, responding to Dr. Mantel's testimony that the interviews were defective, the court noted that "[t]he idiosyncratic details spontaneously supplied by A.V. in her statements to the investigators, which have been independently verified and confirmed . . . are sufficiently compelling that the interview defects noted by Dr. Mantel[] are overcome." Although the court noted that some questions may have been leading or suggestive in nature, they did not irretrievably taint the substance and content

of A.V.'s overall disclosures. The court also found that the interview with the DCF investigator and the police officer was long, but not coercive, and also, that during the lunch break, A.V. had no contact with anyone who had an interest in the outcome or substance of her statements.

¶ 16. The court further found that the timing of A.V.'s disclosures followed a reasonable progression in that she made statements to various neighbors with whom she was comfortable, and those statements were reported to DCF as soon as they reached a certain level of specificity. If the jury credited the statements, the court said, they indicated that the abuse was "fresh" because it continued to occur in the apartment to which she had recently moved. The court found that A.V.'s statements were sufficiently explicit and graphic, as well as biologically and anatomically correct. It also noted that the statements were internally consistent within the DCF interview, and externally consistent when compared to statements she had made to others. Finally, the court found that A.V.'s demeanor and emotional affect were appropriate when making the disclosures. Based on the totality of the circumstances, the court found substantial indicia of trustworthiness and allowed the statements to be admitted, finding that the statements met Dr. Mantel's ultimate criteria of inherent plausibility, consistency, biological and anatomical accuracy, and detail.

¶ 17. The court included a "confidential finding," which was provided to counsel under seal as an attachment to the rest of the order. In the "finding," the trial judge disclosed that he had presided over a juvenile proceeding involving A.V., and had heard testimony by DCF relating to A.V. that, if believed, potentially provided additional indicia of trustworthiness. The "finding" related some of the DCF testimony in that juvenile matter.

¶ 18. At trial, which commenced in October 2010, the witnesses gave substantially the same testimony. In addition to those witnesses, A.V. was called by the prosecution as a witness, and testified briefly that defendant lived in her house, and that she told the truth when she spoke to the police. No cross-examination was conducted. The State also presented Dr. Patnoe, a pediatrician specializing in the area of child abuse, who had conducted a physical exam of A.V. Dr. Patnoe stated that, based on A.V.'s disclosures, "it was highly probable that she was sexually abused." Defendant was convicted, and the court imposed a sentence of twenty-five years to life.

¶ 19. On appeal, defendant claims that the court committed reversible error when it allowed the State to introduce A.V.'s statements made in the interviews under Vermont Rule of Evidence 804a. Specifically, defendant argues that the "time, content, and circumstances of the statements" do not "provide substantial indicia of trustworthiness." V.R.E. 804a(a)(4). He contends that the interview with A.V. was unduly coercive and that the State's expert relied upon inadmissible statements in rendering her conclusion that A.V. likely was sexually abused.

¶ 20. Our review with regard to admission of a child-victim's statements under Rule 804a is deferential. The trial court has "great discretion" in determining whether to admit evidence under the rule, and we do not reverse its decision unless "there has been an abuse of discretion resulting in prejudice." *State v. Willis*, 2006 VT 128, ¶ 20, 181 Vt. 170, 915 A.2d 208 (quotation omitted). We uphold the trial court's conclusion that hearsay statements are trustworthy under Rule 804a(a)(4) if it is supported by the findings, which must be supported by credible evidence in the record. *State v. Gallagher*, 150 Vt. 341, 348, 554 A.2d 221, 225 (1988).

¶ 21. Rule 804a allows admission of statements by a child who is twelve or under if the statements are offered in an aggravated sexual assault case in which the child is the alleged victim, the statements were not taken in preparation for a legal proceeding, the child is available to testify, and "the time, content, and circumstances of the statements provide substantial indicia of trustworthiness." The rationale behind the rule is that a "child-victim's early communications are often highly trustworthy," and thus the rule allows admission of the child's statements "when there is minimal risk of fabrication." Reporter's Notes, V.R.E. 804a.

¶ 22. Defendant concedes that the court's extensive findings were supported by credible evidence, but argues that the findings do not support the court's conclusion that A.V.'s statements possessed sufficient indicia of trustworthiness. The starting point for defendant's argument is that neither interview was conducted pursuant to accepted protocols for interviewing alleged child victims of sexual assault. Defendant argues that the DCF investigator and the police officer had been previously informed of A.V.'s statements to neighbors, and were thus seeking to confirm

the preconceived notion that she had been sexually assaulted by defendant. He alleges that the investigators used leading questions and did not explore other explanations or sources for the information elicited from A.V. Further, defendant contends that the improper interview techniques infected the statements later obtained by the SANE nurse and A.V.'s mother.

■ ¶ 23. This Court has acknowledged the existence of "interviewing protocol," but we have not adopted or endorsed any particular methodology, and we specifically decline to do so here. Instead, we have approved of a multi-factored approach to determine whether a child's statements possess sufficient indicia of trustworthiness, in which the interview forum and methodology may be relevant. See, e.g., *Willis*, 2006 VT 128, ¶¶ 16, 20 (noting that victim consistently described abuse, and there had been no coaching, suggestive questions, or significant breaches in interviewing protocol that had compromised result of interview). The ultimate question is whether, taking all the facts and circumstances together, the conclusion that the child's statements display signs of trustworthiness is supported by the court's findings.

■ ¶ 24. There are several nonexclusive factors that are relevant in determining whether a child's statements have the requisite substantial indicia of truthfulness. See *State v. Tester*, 2006 VT 24, ¶ 17, 179 Vt. 627, 895 A.2d 215 (mem.) (use of nonleading questions, consistency of disclosures, appropriate body language); *State v. LaBounty*, 168 Vt. 129, 136-38, 716 A.2d 1, 7 (1998) (freshness, spontaneity, internal consistency, timing and conduct of interviews, and accuracy with respect to peripheral detail); *State v. Fisher*, 167 Vt. 36, 40-41, 702 A.2d 41, 44 (1997) (risk of fabrication); *State v. Lawton*, 164 Vt. 179, 190, 667 A.2d 50, 59 (1995) (circumstances of initial disclosure, evidence of coercion or manipulation); *In re M.B.*, 158 Vt. 63, 69, 605 A.2d 515, 518 (1992) (setting in which disclosures were made, person to whom disclosures were made, internal consistency, corroboration by medical and other evidence); *Gallagher*, 150 Vt. at 348, 554 A.2d at 225 (manner with which interview was conducted, internal consistency and detail of child's story, child's affect, intelligence, memory and concern for the truth).

■ ■ ¶ 25. The court's findings support the conclusion that A.V.'s statements to the investigators bore sufficient indicia of reliability. One pertinent consideration in this assessment is the

propriety of the child's demeanor, including body language and affect. See *Tester*, 2006 VT 24, ¶ 17; *Gallagher*, 150 Vt. at 348, 554 A.2d at 225. Here, A.V.'s demeanor and emotional affect during both interviews was appropriate for the gravity of the disclosures she was making.

¶ 26. In addition, throughout the interview, A.V. provided new information upon prompting and spontaneously provided idiosyncratic details, such as the purple bottle beside the bed. She spontaneously told the investigators that "sometimes it hurts a little" and spontaneously described the times that the abuse occurred. These details, the court found, were not supplied by, or within, the investigators' questions. At trial, Dr. Mantel conceded on cross-examination that several of A.V.'s inculpatory statements were spontaneous and provided as answers to open-ended questions.

¶ 27. Peripheral detail is another factor that we have looked to in determining trustworthiness. In *LaBounty*, for example, the children provided accurate peripheral details, such as the defendant's appearance and clothing on the day of the incident, the interior of the house, the defendant's wife's activities on the same day, and the rooms in which the incident occurred. 168 Vt. at 138, 716 A.2d at 7. We noted that the peripheral detail of the children's statements was a factor supporting the trial court's finding of trustworthiness. *Id.* In this case, A.V. accurately described peripheral details, such as the bedroom and furnishings. She also described the location and color of the bottle of lubricant used by defendant, which she said defendant would use to "lubricate" his penis. Furthermore, as in *LaBounty*, A.V. provided information about her mother's — defendant's girlfriend's — activities during the assaults, stating that the abuse occurred when her mother was not home.

¶ 28. Another factor articulated in *LaBounty* is the biological and anatomical accuracy of the children's statements. In that case, the children stated that the defendant had put his "peepee" in their mouths, and one child provided additional details about the assaults; we stated that the detail of the children's statements supported the trustworthiness finding. *Id.* Furthermore, in general, extensive precocious sexual knowledge provides indicia of the reliability of a child's hearsay statements. See *State v. Swan*, 790 P.2d 610, 630-33 (Wash. 1990) (en banc) (cited in *State v. Oscarson*,

2004 VT 4, 176 Vt. 176, 845 A.2d 337). Likewise, here, the substance of A.V.'s disclosures was biologically and anatomically correct. She provided, using age-appropriate terminology, details about defendant's anatomy, the conduct of the assaults, and the relationship between defendant's body and her own.

¶ 29. A.V.'s statements were also consistent within the interview, and when compared to statements she had made to others. As in *Tester*, where the children consistently described the abuse and identified the defendant as the perpetrator, 2006 VT 24, ¶ 17, and in *M.B.*, where the children's statements were consistent internally and with each other, 158 Vt. at 69, 605 A.2d at 518, A.V.'s subsequent statements were consistent with her initial disclosures of abuse and consistent within the interview itself.

¶ 30. Finally, during the interview at the hospital, once A.V. began talking, she became "pretty verbal" and did not need more prompting or repeated questions. She spoke so fast, in fact, that the SANE nurse had to ask her to stop or slow down to take notes. During this interview, A.V. was looking around, attentive, and making eye contact with the SANE nurse and her mother. Her statements provided additional detail, were graphic, and were consistent within that interview and with statements she had previously made.

¶ 31. Defendant argues that the interviews at school and at the hospital were improper, and that these interviewing failures counter any conclusion that A.V.'s statements contained sufficient indicia of truthfulness. The interview at the school was lengthy, but was not egregiously coercive, A.V. did not feel overwhelmed or coerced, and her statements were freely made by conscious decision and through negotiation. The DCF investigator and the police officer asked some leading or suggestive questions based on the independent information they had received, but A.V. did not simply parrot the questions or repeat back the same information. She remained "strong, smart, [and] resilient," and appeared to be "in control of the substance of the interview" and the timing of the disclosures. During the interview at the hospital, the DCF investigator and the police officer told A.V. to tell the SANE nurse what she told them, and that it was important to tell the truth. A.V.'s mother was present. However, A.V. was talkative and attentive, and did not need repeated questions for prompting.

¶ 32. The leading questions and failure to evaluate alternative explanations for A.V.'s statements are countervailing factors in

the multi-factored approach. See *Willis*, 2006 VT 128, ¶¶ 16, 20. However, the court found that there was minimal risk of fabrication in A.V.'s recall and relay of abuse, despite the perceived interview failures. Specifically, the court found that the failure to follow the approach suggested by Dr. Mantel did not "irretrievably taint[] the substance and content of the overall disclosures made by A.V." Because there was no compelling indication that A.V.'s statements in either interview were in fact the result of coercion and because the questioning did not appear to taint her overall disclosures, it cannot be said that whatever interview failures occurred here are sufficient to overcome the determination that the findings support the conclusion that A.V.'s statements contained substantial indicia of trustworthiness. See *id.* ¶ 20 (rejecting defendant's argument that breaches in protocol rendered statements without sufficient indicia of truthfulness and holding that this Court's job is not to reweigh evidence or reassess credibility).

¶ 33. Defendant next argues that the trial court's reliance on the "confidential finding" in reaching its conclusion that A.V.'s out-of-court statements were admissible under Rule 804a fatally compromised the court's conclusion. He contends that the evidence reflected in the "finding" was gathered in a proceeding in which defendant had no opportunity to participate, cross-examine, or otherwise assess its accuracy.

■ ¶ 34. Although the court characterized the paragraph describing the DCF testimony as a "finding," the court did not indicate its own acceptance of the testimony, and a recitation of testimony is not a finding of fact. *Krupp v. Krupp*, 126 Vt. 511, 514, 236 A.2d 653, 655 (1967). In fact, the court specifically stated that it was not deciding the truth of DCF's assertions. Moreover, the court made clear that the information "should not play a principal role, if any at all," in the court's Rule 804a determination. The court specifically stated that A.V.'s statements must possess inherent indicia of reliability, that they must stand on their own, and that the impact of the DCF testimony was secondary to the evidence in this case. The court explained that the "confidential finding" was a way to disclose the court's role in the juvenile proceeding, and not a basis for the decision. For those reasons, we conclude that the "confidential finding" was not a finding of fact, and that the trial court's conclusion that A.V.'s statements bore substantial indicia of truthfulness did not rest on that information. As noted, the court's ultimate conclusion on the

Rule 804a issue was amply supported by the court's other findings, without any reference to the sealed attachment to its order.

¶ 35. Defendant's final contention is that Dr. Patnoe's testimony about the likelihood that A.V. had been sexually abused created prejudice because she made that conclusion based upon the Rule 804a statements. Defendant acknowledges that counsel made a strategic judgment at trial to waive any objection to the testimony based on *State v. Catsam*, 148 Vt. 366, 534 A.2d 184 (1987), and therefore does not claim that the testimony itself was error. Rather, defendant argues that the testimony was tainted by virtue of her reliance on what he contends are inadmissible statements. Because we conclude that A.V.'s statements during the initial DCF interview were admissible, we reject defendant's argument that consideration of the statements tainted Dr. Patnoe's conclusions.

*Affirmed.*

¶ 36. **Skoglund, J.,** concurring. I would affirm the trial court's conclusion that the time, content, and circumstances of the child-victim's statements provided substantial indicia of trustworthiness, in part because our review of the admission of hearsay evidence under Vermont Rule of Evidence 804a is deferential, but also because I agree that the child's provision of new information and idiosyncratic details provides substantiating content. However, I cannot agree with the trial court or this Court that what the child endured in the August 27 interview was not coercive. Rather, I agree with the expert testifying that the two-part interview of A.V. was egregiously coercive for a six-year-old. But, as noted by the trial court, "[t]here is no compelling indication that A.V.'s statements were *in fact* the product, or result of any coercion, as opposed to a 'conscious' decision . . . that it was simply time . . . to tell what had happened."

¶ 37. I believe it noteworthy that the court found the DCF investigator had "not received extensive training in interview techniques for children, but ha[d] attended a few training sessions. There was no evidence as to [the police officer]'s training, if any." As found by the court, the interview of this six-year-old child lasted "the better part of the entire day." During the morning session she repeatedly asked to return to her classroom. She was "more withdrawn," actively "changed the subject to avoid talking

about Reid," and essentially denied there was any problem with him. The court noted, "[n]otwithstanding the investigator's efforts, and the repeated questions and length of the morning interview, A.V. continued to deny that Defendant (or anyone) had committed any abusive acts." However, the court below also found that "[a]lthough the morning interview did last a long time, the questions were persistent, and A.V. did make repeated requests about lunch, she did not ask, or insist specifically that the interview be stopped." Really? After being reminded that she was talking to a police officer and an investigator, this little girl did not insist the interview stop?

¶ 38. The interview resumed after lunch with the interviewers "asking A.V. more pointed questions. . . . A.V. again instead kept asking, repeatedly, to go back to the classroom, and became increasingly more discomforted, and at the same time hesitant to talk, with her head down." As with the morning session, the court noted that she never "said emphatically that she would not talk any more about the topics insisted upon by the investigators." According to the findings of the court below, the interview did not end until after the school day was over.

¶ 39. Dr. David Mantel is, as the court recognized, "a highly experienced, and well-respected child psychologist who has been active in this field of interviewing alleged child victims of sexual abuse for many years." According to Dr. Mantel in his testimony at the Rule 804a hearing, there are at least six well-developed protocols for forensically interviewing alleged child victims of sexual abuse. He described the interview at the school as lacking any phased structure, marked by confirmatory bias, and using leading or suggestive questions.

¶ 40. According to Dr. Mantel, all of the recognized protocols involve a " 'phased' interview process, and all of them discourage use of, or at least over-reliance on 'leading questions,' repeating the same question in succession, and incorporation of outside information for which the investigator is simply seeking confirmation, or repetition by the child." He described the August 27 interview as "a failure" and an "egregious case." He testified that the entire interview was " 'inherently coercive,' and even 'brutally coercive' because of the length, and the investigators' decision to ignore A.V.'s repeated requests to go to lunch (in the morning) or go back to her classroom (in the afternoon)." As found by the trial court, Dr. Mantel was " 'flabbergasted' by what he viewed as the

unprofessional techniques used by" the two investigators. Ultimately, as the court noted, Dr. Mantel declined to express "any opinion as to the actual credibility or truthfulness of the content or substance of the statements made by A.V." Properly so. Ultimately, that is a decision for the court.

¶ 41. Dr. Mantel also had criticisms for the interview with the nurse at Copley Hospital, but I believe the point has been made. It is not that the interviewers were malicious or ignorant. Rather, the case suggests — strongly suggests — that they were, at best, poorly trained. While this Court has not reviewed or endorsed any particular protocol for conducting interviews of suspected child abuse victims, our decisions focus on several common factors for assessing reliability and trustworthiness of out-of-court disclosures made by children. These include "freshness, spontaneity, internal consistency, and accuracy with respect to surrounding detail" as well as the "timing and conduct of the interviews." *State v. LaBounty*, 168 Vt. 129, 136-38, 716 A.2d 1, 6-7 (1998). For example, in *LaBounty* we noted that neither of the interviewers had been informed of the details of the alleged abuse prior to the interviews, so neither was seeking to confirm any preconceived ideas of what the children should be disclosing. *Id.* at 138, 716 A.2d at 7. Again in *State v. Tester*, the Court noted that the child's interview "had been conducted in a highly professional manner, without suggesting answers or content." 2006 VT 24, ¶ 28, 179 Vt. 627, 895 A.2d 215 (mem.). That was certainly not the case here. The interviewers were seeking confirmation of preconceived and expected content.

¶ 42. When the afternoon interview began, the interviewers reminded A.V. that they had talked to her neighbor Ariel, her cousin, and her sometime childcare provider and asked A.V. again to tell them, for example, "what she told Ariel" because they "knew something was going on at home." What follows is a small sample:

> S.M. [interviewer]: Okay. I talked to Ariel, I talked to Christy, and I talked to Leola, all of them. And they told me something. Do you know what they told me?
>
> A.V.: What?
>
> S.M.: They all told me that you told them something that's going on at home that they were a little bit

concerned about. . . . So I know that you told them something. And remember what I told you that it's okay to tell us the truth?

A.V.: Yeah.

S.M.: That you're not going to be in any trouble.

A.V.: Yeah.

S.M.: It's very important that I just want you to tell us the truth, okay? Because I already know that you told them something that's going on at home.

A.V.: Yeah.

S.M.: Do you want to talk to me about that?

A.V.: Can I just say one thing and go back to my classroom because I want to.

S.M.: Okay. But we need to talk to you about this. Okay?

A.V.: Okay.

S.M.: And after we're done talking about it, you can go to your classroom.

A.V.: I will just — how about I just say one thing and I can go back to my classroom? How about that?

S.M.: What do you want to tell me?

A.V.: Um, sometimes when my mom is going to work, sometimes she comes back at — sometimes she comes back in morning, sometimes she comes back at night.

This type of questioning is what Dr. Mantel believed "infected" the interview by " 'confirmatory bias' because the investigators repeatedly used outside information to frame their questions."

¶ 43. The court below also noted that the State presented no counterpoint to Dr. Mantel's testimony. Thus, the court had to find that the interview was not coercive in spite of this noted expert's opinion that this all-day interview was seriously flawed. I cannot understand the basis for the court's contrary conclusion. In this case, the court found enough in the child's responses to validate it for trustworthiness. However, it cannot be ignored that the substantial failure by the DCF investigator and the police officer

to follow recognized and established child-interview protocols weighed heavily against the necessary determination of inherent trustworthiness and reliability. I agree that, in this case, the child's eventual discussion of the abuse had new information and idiosyncratic details that provided substantiating content and, as found by the trial court, that "[t]here is no compelling indication that A.V.'s statements were *in fact* the product, or result of any coercion." (Emphasis added.) However, I cannot help but be concerned that proper training is not being provided in this extremely critical and highly sensitive area of investigation.