*Note: Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

### ENTRY ORDER

SUPREME COURT DOCKET NO. 2014-105

MARCH TERM, 2015

| | | |
|---|---|---|
| State of Vermont | } | APPEALED FROM: |
| | } | |
| | } | Superior Court, Addison Unit, |
| v. | } | Criminal Division |
| | } | |
| | } | |
| Thomas A. Tatro | } | DOCKET NO. 559-7-12 Ancr |

Trial Judge: Robert A. Mello

In the above-entitled cause, the Clerk will enter:

The State appeals from the trial court's exclusion of certain hearsay statements made by a putative child victim of aggravated sexual assault. The trial court concluded that the time, content, and circumstances of the statements did not provide substantial indicia of trustworthiness. The State challenges the ruling with respect to statements made during a videotaped interview and a statement that the child made to his mother. The State maintains that the trial court's findings do not support its conclusion that the statements at issue were untrustworthy. We affirm.

In July 2012, defendant was charged with aggravated sexual assault of C.H., a six-year-old boy. Defendant was fifty-three years old at the time of the alleged offense. In April 2013, the State filed notice of its intent to call witnesses at trial to testify to hearsay statements that C.H. made to his mother and others about the alleged offense. The State argued that the hearsay statements were admissible under Vermont Rule of Evidence 804a. Defendant moved to exclude this evidence.

Following three days of evidentiary hearings, the court granted defendant's motion to exclude. It made the following findings. C.H. was born in November 2004. He lives with his mother and stepfather. C.H. has a number of developmental disabilities, most notably Microcephaly and Autism Spectrum Disorder. CH.'s ability to communicate is significantly impaired and he has significant cognitive limitations. He has difficulty with his attention span, for example, and he has memory impairments that make it difficult for him to relate details of events. C.H. was not toilet trained until he was almost seven years old, and he has difficulty cleaning himself after a bowel movement. Parents must check C.H.'s bottom each day to make sure he is clean.

On Sunday, May 15, 2011, mother left C.H. in the care of defendant, who is her mother's live-in boyfriend. C.H. referred to defendant as "Papa Tom." When mother returned, C.H. insisted that she take him home. Over the next several days, C.H. seemed withdrawn. He stayed in his room and kept to himself and he was afraid to wipe his bottom for fear it would hurt.

Mother and stepfather did not notice any blood in C.H.'s pants or any other sign of injury to his bottom. When mother asked if anything was wrong, C.H. did not want to talk about it.

On Wednesday, May 18, mother received a telephone call from her mother who relayed a rumor that defendant had sexually abused his own young daughter years earlier. This caused mother to wonder if anything untoward had occurred between defendant and C.H. Mother decided it was best to see if C.H. brought anything up on his own, so she did not immediately question him about her concern. The following day, C.H. was crying after school. When mother asked what was wrong, C.H. said that he didn't want to get in trouble. Mother suspected that C.H. might be crying because of something defendant had done. She asked C.H. if anyone had touched him in a bad spot. C.H. replied, "Yes Papa Tom touched me." When mother asked where, C.H. pointed to his genital area and to his bottom. In response to further questioning, C.H. told mother that defendant had stripped him down to his underwear, kissed his chest, and stuck a pencil in his butt. C.H. then made similar statements to stepfather.

The following day, Friday, May 20, mother sent C.H. to school with a note to his teacher, which said "[C.H.] has told me and his father that he has been touched in a 'bad place' by someone we know. I was wondering if the school nurse could possibly look at him. I would really appreciate it." The child's teacher gave the note to a school counselor, who called mother and spoke with her and stepfather. The counselor then spoke to C.H. with another witness present. The counselor asked C.H. about his visit with defendant. She asked if defendant had touched him in a "bad place." C.H. responded in the affirmative. When the counselor asked where defendant had touched him, C.H. pointed to his crotch and said "right here," and his rear and said "right here." The counselor thought C.H. seemed a little anxious but otherwise appeared to be "his normal self." The counselor called the Department for Children and Families (DCF).

That same day, mother took C.H. to be examined by a Sexual Assault Nurse Examiner (SANE) for any signs of sexual assault. When the SANE nurse asked C.H. what had happened, C.H. replied that Papa Tom had kissed him from his chest to his belly and put a pencil in his butt, which really hurt. When the nurse tried to examine C.H., he started crying and grabbing onto his pants to prevent them from being pulled down, rendering an examination impossible.

DCF arranged for C.H. to be interviewed by a police detective and a DCF employee on May 26. In the meantime, mother tried to discuss the alleged event with C.H. every day, even though the police and nurse had told her not to do so as it might traumatize C.H. Mother indicated that C.H. was "very quiet" and did not want to talk about it, but mother "kept pushing" because she wanted "to get as much information about it as possible." On each occasion, C.H. told mother that defendant had taken his clothes off and stuck a pencil up his butt. At one point, C.H. told mother that defendant had also kissed his penis, but he later "took that back and said, "no, that didn't happen."

On May 26, mother told C.H. that he had to go speak with a detective that day because Papa Tom had been accused of touching him. Mother told C.H. to tell the detective what he had told her. On the way to the interview, as mother reviewed the allegations with C.H. again, C.H. told her that the event with defendant had occurred in the bedroom.

The court made numerous findings about the interview that then occurred, including the following. At the outset of the interview, the detective asked C.H. if he had any questions, C.H.

replied "Yeah . . . Papa Tom just touch me in bad places. The detective asked C.H. to tell him about that, and C.H. stated, "Papa Tom just touch me in the bad places." The court found that, in response to this unsolicited statement, the detective and the DCF employee did not ask any questions designed to ascertain if C.H. was describing something that he actually recalled or if he might instead be repeating something mother coached him to say. While the detective normally asked questions designed to determine how many times an adult has spoken to a child before an official interview, he acknowledged that he failed to do so in this case.

The detective asked C.H. if he knew the difference between the truth and a lie. C.H. replied, "A lie means you're doing something that you're saying that at the cops" and "you're telling something for the cops." When the detective asked, "do you have to tell the truth to the cops or tell a lie to cops?" C.H. responded "Tell the truth (indiscernible) the cops." The detective said, "What?" and C.H. replied, "Lie to the cops." The detective then asked, "Do you lie or tell the truth?" to which C.H. replied, "Tell the truth." After having C.H. confirm that the true color of a couch in the room was green, and that calling it pink would be a lie, the detective said, "And when we talk in here today, it's very, very important that we tell the truth. Can you do that for me?" C.H. answered, "Yeah."

During the interview, C.H. indicated that defendant had touched his crotch and his rear. He said that defendant put a pen in his butt, and that he did not like that. C.H. stated that his mother had asked him if it hurt, and he said no. C.H. said that the incident occurred at his grandmother's house and that defendant had been watching him while his mother and grandmother were out. He stated that defendant had wiggled his penis. C.H. later stated that defendant had put a pencil up his butt and that it hurt. When the detective asked how defendant had touched C.H.'s "front part," he replied "He touched me in the front with something. He touched me with a toothbrush. . . . He rub it."

The detective later asked C.H. if he liked to fish and if he had been fishing lately. C.H. replied that he had been fishing the day before, and then told an "obviously fabricated story" about having caught a monster fish that had slapped him with its tail. C.H.'s mother testified that C.H. had fabricated stories in the past. He had, for example, made up stories of having gone to a friend's house. He also claimed once that his stepbrother had trashed his room when the stepbrother had not been at the house.

Based on these and other findings, the court turned to the criteria for evaluating hearsay statements by putative child victims of sexual abuse. As relevant here, such hearsay statements are admissible if the court finds that "the time, content, and circumstances of the statements provide substantial indicia of trustworthiness." V.R.E. 804a(a)(4).

The court found that a number of factors supported a finding that C.H.'s statements to his mother and others were trustworthy. First, he made his initial disclosures to persons whom he trusted, initially to his mother at the bus stop after school, then to his stepfather later that same day, and then to his school counselor the following day. His disclosures to his mother, stepfather, school counselor, and SANE nurses were made just days after the alleged offense. Additionally, these disclosures were largely consistent with each other. C.H. told them that Papa Tom had taken off his clothes, kissed him in the front, and put something in his butt, allegations that C.H. repeated when speaking with the detective and the DCF employee. The court further found that C.H. could relate some peripheral details, despite his cognitive limitations. For example, C.H. related that the events occurred at his grandmother's house, that his mother and

3

grandmother had gone somewhere, and that he was alone with Papa Tom. He told the detective that Papa Tom was "being sorry to me," that Papa Tom told him "you don't have to do that again," and that he ate "little circle crackers" but Papa Tom did not eat the crackers. Finally, the court found that C.H.'s behavior following alleged assault, as described by mother, was consistent with what one might expect of a child who has just been abused: he wanted to be taken home as soon as his mother returned to grandmother's house; he was withdrawn afterwards and largely kept to himself; he was afraid to wipe his bottom for fear that it would hurt; he refused to allow the SANE nurse to examine his bottom at the hospital; and he had nightmares for a few months after the alleged assault.

Nonetheless, the court found that other facts undermined a conclusion that C.H.'s statements were trustworthy. It found that C.H.'s disclosure to his mother was not spontaneous because the subject of C.H. being touched in "a bad spot" was first raised by mother, who suspected that something untoward had occurred. C.H.'s unsolicited allegation, made at the outset of the interview with the detective, that "Papa Tom just touched me in bad places," also could not be viewed as a spontaneous disclosure given that C.H.'s mother had discussed the allegations with C.H. every day for many days, including on their way to the interview. The court also found that while there were consistencies in C.H.'s reports, there were also significant inconsistencies. The court cited as an example that at one point C.H. told his mother that defendant had kissed his penis, but later "took that back" and said "no, that didn't happen." The court also noted that on the way to the interview, C.H. told his mother that the alleged assault occurred in the bedroom but said at the interview that it occurred in the living room. He told mother that Papa Tom had put a pencil up his butt, but told the detective that it was a pen. The court also found that C.H. was inconsistent in reporting if the pencil hurt him, and if the television was off or on at the time of the alleged assault. Additionally, the court found C.H. inconsistent about whether he would be truthful during the interview with the detective. At one point he said he would tell the truth, but another point said "Lie to the cops." The court concluded that C.H.'s statements did not demonstrate an unequivocal concern for the truth.

Finally, and most importantly to the court, it found substantial evidence that C.H. made up stories. The court cited C.H.'s fabrication of stories about going to a friend's house and his story that his stepbrother had trashed his room. The court noted that during his interview, C.H. referred to the couch he was sitting on as "my couch" and said "this is where I sleep." The court also found C.H.'s claim that defendant had rubbed his penis with a toothbrush not believeable. He also told "an obviously fabricated story" of having caught a monster fish.

The court observed that children with disabilities are known to be vulnerable to abuse and often have cognitive impairments that limit their ability to describe their experiences. Rule 804a recognized, however, that reports of abuse by children were not always reliable and that the rule forbade their use at trial unless the court could specifically find, based on the totality of the circumstances, that the timing, content, and circumstances of the child's reports contained substantial indicia of trustworthiness. Based on the totality of the circumstances, the court concluded that there was a serious risk that C.H.'s allegations against defendant were, at least to some extent, fabricated. The court was especially wary of any allegation that focused on C.H.'s bottom, given his delays in toilet training, his ongoing difficulties cleaning himself, and his parents' need to focus daily on checking his bottom. The court concluded that the time, content, and circumstances of C.H.'s statements did not provide substantial indicia of trustworthiness. It thus granted defendant's motion to exclude the child's statements to his mother, stepfather,

4

school counselor and other school employee, SANE nurse, police detective, and DCF employee. This interlocutory appeal followed.

Our review of the trial court's decision is deferential. State v. Reid, 2012 VT 65, ¶ 20, 192 Vt. 356. We recognize the trial court's "great discretion in determining whether to admit evidence under [Rule 804a], and we do not reverse its decision unless there has been an abuse of discretion resulting in prejudice." Id. (quotation omitted). "We uphold the trial court's conclusion . . . under Rule 804a(a)(4) if it is supported by the findings, which must be supported by credible evidence in the record." Id.

The State argues that the trial court did not specifically address many of the factors relevant to an assessment of reliability. It argues that C.H.'s statements during the interview were, on the whole, consistent with those made to his mother and others; his body language was appropriate when describing what had occurred; and he was able to relate some peripheral details despite his cognitive and language limitations. The State also notes that the interview occurred in a comfortable setting and that there was no evidence of coercion or manipulation during the interview. While acknowledging some inconsistencies, the State argues that the child's statements did not need to be flawlessly consistent to be considered trustworthy. It faults the court for failing to adequately consider possible explanations for any inconsistencies. The State also challenges the court's conclusion that mother's discussions with C.H. rendered the child's disclosure during the interview "nonspontaneous," citing evidence from its expert that repeated unbiased questioning by a parent before a forensic interview may actually improve a child's memory and help them produce more information. The State also challenges the court's finding that there was substantial evidence that C.H. made up stories. According to the State, the trial court failed to recognize C.H.'s developmental status and communication difficulties. It also failed to distinguish minor childhood fabrications and lying about serious allegations of sexual assault. The State further argues that there is no reason why C.H.'s statement that defendant rubbed his penis with a toothbrush was not believeable, or that C.H. could not have been penetrated with pencil or pen. It maintains that C.H. consistently agreed to tell the truth.

As to C.H.'s statement to mother that "Papa Tom stuck a pencil up my butt," the State again argues that court's conclusion about trustworthiness is contrary to its findings and unsupported by record evidence. It notes that C.H. made the disclosure to mother shortly after the alleged offense, and this disclosure was largely consistent with disclosures made to others. The State also argues that C.H. displayed behavior that might be expected of an abused child.

We agree with the State on several points. There does not appear to be support for the court's observation that if an object was inserted into C.H.'s anus, he could not have seen what it was and "it almost certainly would not have been a pencil or a pen." Similarly, it is not clear why it would be "impossible to believe" that defendant rubbed C.H.'s penis with a toothbrush or something that felt like a toothbrush to this developmentally disabled child. It might be, as well, that a different factfinder would not equate a young child's lying about visiting a friend or blaming someone for a dirty room with making false accusations about being sexually assaulted. In the end, however, these and the other issues raised by the State above were questions that the factfinder here was asked to resolve. We cannot reverse the court's decision "simply because a different result might have been supportable, or because another court might have reached a different conclusion." In re L.R.R., 143 Vt. 560, 562 (1983).

The court's discretionary decision must stand "if there is a reasonable basis" for it, id., and the court provided reasonable grounds for its decision here. The court made extensive findings as to various indicia of reliability, and it was not required to make findings on all possible factors relevant to an assessment of trustworthiness. See Reid, 2012 VT 65, ¶ 24 (reciting "nonexclusive" factors that are relevant in determining if child's statements have requisite indicia of truthfulness). As set forth above, the court recognized that there were facts supporting a finding that C.H.'s statements were reliable, including the fact that the disclosures were made shortly after the alleged incident and his odd behaviors as reported by mother after having spent three hours with defendant. It concluded, however, that those facts were substantially outweighed by the facts indicating unreliability, most notably C.H.'s repeatedly making up stories, such as his story of Papa Tom rubbing his penis with a toothbrush. The court determined that the inconsistencies in C.H.'s reports, his "unclear commitment to telling the truth," his repeatedly making up stories, the fact that it was C.H.'s mother, not C.H., who first brought up the subject of possible abuse, and the absence of corroborating medical evidence, required that the statements be excluded. The court's findings are supported by evidence in the record, and while the State disagrees with the conclusion reached by the court, it has not demonstrated that the court abused its discretion as a matter of law requiring reversal. We leave it to the trial court to weigh the evidence and assess the credibility of witnesses, and "[w]e will not second-guess the court below." In re L.R.R., 143 Vt. at 565. The court acted within the scope of its discretion here, and we therefore affirm its decision.

Affirmed.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice

_____
Marilyn S. Skoglund, Associate Justice

_____
Beth Robinson, Associate Justice