**ENTRY ORDER**

2024 VT 53

SUPREME COURT CASE NO. 24-AP-202

AUGUST TERM, 2024

| | | |
|---|---|---|
| State of Vermont | } | APPEALED FROM: |
| | } | |
| | } | |
| v. | } | Superior Court, Rutland Unit, |
| | } | Criminal Division |
| | } | |
| Tate Rheaume | } | CASE NO. 23-CR-06504 |
| | } | |
| | | Trial Judge: Cortland Corsones |

In the above-entitled cause, the Clerk will enter:

¶ 1.     Defendant Tate Rheaume appeals from the trial court's decision granting the State's motion to hold him without bail under 13 V.S.A. § 7553. He claims that the court incorrectly concluded that the evidence of guilt was great. He also claims that the trial court abused its discretion when it refused to release him with conditions. We affirm.

I.  Procedural and Factual Background

¶ 2.     Defendant was originally charged in July 2023 with operation of a vehicle in a grossly negligent manner resulting in death in violation of 23 V.S.A. § 1091(b) and attempt to elude an officer resulting in death in violation of 23 V.S.A. § 1133. The charges arose from allegations that defendant, while fleeing from police officers in a motor vehicle, struck a marked police cruiser, killing its driver, Officer Jessica Ebbighausen.

¶ 3.     After his arraignment on those initial charges, defendant was released with conditions after posting a surety bond. Defendant was released into the custody of his sister, who was designated as a "Condition 4" responsible adult for purposes of 13 V.S.A. § 7554(a)(1)(A). In November 2024, the conditions of release were amended by stipulation and defendant's mother was included as an additional Condition 4 custodian.

¶ 4.     On March 29, 2024, the State filed a superseding information. Among the seven counts in the new information, the State charged defendant with aggravated second-degree murder in violation of 13 V.S.A. § 2311, a felony punishable by life imprisonment. The information alleged three independent aggravating circumstances: "At the time of the murder, the defendant knowingly created a great risk of death to another person or persons," id. § 2311(a)(4); "[t]he murder was committed for the purpose of avoiding or preventing lawful arrest by a law enforcement officer of any person, or effecting an escape by any person from lawful custody," id. § 2311(a)(5); and "[t]he victim of the murder was known by the person to be . . . a law enforcement

officer [who] was performing his or her official duties," id. § 2311(a)(7). The State also moved to hold defendant without bail under 13 V.S.A. § 7553.

¶ 5. On April 9, 2024, defendant was arraigned on the new charges contained in the superseding information. The court issued a mittimus and ordered that defendant be held without bail pending further proceedings. The court held a weight-of-the-evidence hearing over the course of three days in April, May, and July 2024. The State offered evidence in the form of sworn statements, affidavits, expert reports, video and audio recordings, and other documentation. The court also heard testimony from defendant's sister and mother, the two family members who had acted as his Condition 4 custodians during his previous conditional release.

¶ 6. Thereafter, the court issued a written decision granting the State's motion and ordering defendant to be held without bail pursuant to § 7553. Based on the admitted evidence, the court concluded that a jury could find the following. Defendant has two young children with Jasmine Baker. At the time of the incident, Baker was residing with her partner, Zachary Trombley, in Rutland; defendant was residing with his sister in New Hampshire.

¶ 7. On July 7, 2023, defendant broke into the residence of Baker and Trombley to see his children, knocking out a windowpane to gain access. He did not have permission from Baker or Trombley to be at their residence. At the time, Baker was at a courthouse seeking a relief-from-abuse order against defendant for an incident that had occurred earlier that day. Baker and Trombley remotely viewed defendant on their security camera inside the residence and contacted law enforcement.

¶ 8. Officer Jared Dumas responded to the residence in full uniform and in a marked police cruiser. Upon arriving, he saw defendant's truck parked in the driveway with the engine running. When Officer Dumas approached the residence, defendant stuck his head out of a door. Officer Dumas instructed defendant to exit the residence and remain seated on the porch. Defendant complied and explained that he had Baker's permission to collect his belongings at the residence. To confirm defendant's explanation, Officer Dumas contacted Trombley. Trombley, who was waiting for Baker outside of the courthouse, included Baker on the call and both stated that defendant did not have permission to be at the residence. Officer Dumas then asked Baker whether she wanted to press charges against defendant.

¶ 9. Upon hearing Officer Dumas's question, defendant fled towards his truck. Officer Dumas grabbed defendant's arm as defendant entered the vehicle, but defendant pulled free and "peeled out" of the driveway. Officer Dumas then ran to his cruiser, activated his lights and sirens, and pursued defendant. Defendant fled down several different streets while Officer Dumas gave chase. After reaching the intersection of Killington Avenue and Stratton Road, defendant turned left onto the latter, whereupon Officer Dumas radioed in the pursuit to dispatch.

¶ 10. Defendant eventually approached an intersection with Woodstock Avenue. With traffic ahead, and Officer Dumas catching up, defendant turned left into a parking lot, driving through bushes and over a curb onto Woodstock Avenue. Woodstock Avenue is a main street in Rutland City that has two lanes of traffic in both directions with a posted speed limit of thirty-five miles per hour. Defendant turned west on Woodstock Avenue and reached speeds of sixty to seventy miles per hour, with Officer Dumas continuing his pursuit.

¶ 11. As Officer Dumas approached defendant, he noticed traffic ahead of defendant in both westbound lanes of Woodstock Avenue. Officer Dumas also observed two fully marked cruisers approaching from the opposite direction in the eastbound lanes with their lights and sirens activated. Officer Dumas was approximately 100 feet behind defendant when defendant left the westbound lane and crossed the double yellow centerline. When defendant crossed over into the opposite lanes of travel, the two approaching police cruisers moved into the right-hand eastbound lane. Defendant then crossed from the left-hand eastbound lane into the right-hand eastbound lane. Defendant drove directly into the first police cruiser in line, striking it nearly head-on but angled slightly towards the driver's side of the cruiser.

¶ 12. Defendant took no evasive action in the leadup to striking the police cruiser. He failed to brake, slow down, or swerve to avoid the collision. He struck the police cruiser at a high rate of speed. Before crossing the centerline into the opposite travel lanes, defendant had a clear view of the oncoming cruisers. The cruisers' sirens and blue lights were audible and visible from defendant's position.

¶ 13. Defendant struck the first police cruiser with such force that the impact of the collision destroyed the cruiser. Officer Ebbighausen was thrown from the vehicle and declared dead at the scene. Her partner, Officer Richard Caravaggio, sustained serious injuries. The force of the collision caused defendant's truck to flip over and land on top of the other eastbound cruiser operated by Officer Kelsey Parker. Defendant also suffered serious injuries. At the scene, he told Officer Dumas that he had fled because Baker was going to press charges.

¶ 14. In the leadup to the collision, Officers Ebbighausen, Caravaggio, and Parker had been dispatched after being informed of an ongoing car chase arising from a suspected burglary. As the two cruisers turned right onto Woodstock Avenue heading easterly, they began their approach to the scene in the left-hand eastbound lane with their lights and sirens on. Travelling at thirty to forty-seven miles per hour, the police cruisers approached the intersection with Deer Street. At that point, Officer Parker could hear the sirens and see the blue lights of Officer Dumas's cruiser as he approached from the opposite direction. Officer Parker also saw defendant's truck approaching in the lefthand westbound lane. Defendant then began to cross the yellow centerline and headed towards the two oncoming cruisers. Officer Ebbighausen pulled her cruiser into the righthand eastbound lane in an effort to avoid a collision with defendant. Officer Parker made the same maneuver. As defendant continued his rapid approach, Officer Ebbighausen veered further to the right. Defendant drove his truck directly into her cruiser at a high rate of speed.

¶ 15. According to the cruiser's data recorder, Officer Ebbighausen's cruiser was travelling at approximately forty-seven miles per hour and was slowing down as she approached the time of impact. The recorder also revealed that she had begun braking roughly 4.2 seconds before impact and was steering her cruiser into the far righthand lane approximately 1.5 seconds before impact. Her speed at impact was approximately twenty-four miles per hour. The State's accident reconstructionist opined that defendant was traveling between seventy-six and eighty-two miles per hour at the time of impact.

¶ 16. Defendant was interviewed by Officer Jay Riggen at the hospital on the day of the incident and admitted that he was trying to escape from law enforcement. He stated that he crossed into the opposite lane of travel to avoid the traffic in front of him and that he did not see the police

cruisers coming from the opposite direction. However, he provided Officer Riggen with inconsistent versions of how the collision occurred. Defendant denied any intent to injure himself or others. He admitted that he took multiple prescribed medications and used cannabis earlier that day. Defendant estimated his impairment level at a seven or eight on a scale of ten. Officer Riggen concluded that defendant was under the influence at the time of the collision and was too impaired to safely operate a vehicle.[1]

¶ 17.   The court also found that, if released, defendant could reside with his sister in New Hampshire as he had before the incident and after his initial release into her custody under "strict" conditions. Defendant's sister had supervised defendant's medication intake when acting as the responsible adult, but she found the supervision requirements overly taxing. That led to the court including defendant's mother as another Condition 4 custodian to split the responsibilities with his sister. The sister agreed to again act as a Condition 4 custodian under the previous arrangement, but admitted that she had previously found it difficult to provide full-time supervision and felt that the strict curfew would negatively impact defendant's mental health. Defendant's mother similarly agreed to act as a Condition 4 custodian under the same arrangement, with her supervising defendant only on weekends and holidays at her home in Vermont. Defendant proposed that he be released under the previous conditions, with which he had complied.

¶ 18.   Using the standard imposed under Vermont Rule of Criminal Procedure 12(d), the court concluded that the evidence of guilt was great because the State had shown that the facts were legally sufficient to sustain a guilty verdict for aggravated second-degree murder. It concluded that there was sufficient evidence for a jury to find that defendant "directly caused the death of Officer Ebbighausen by crashing his truck head-on into her cruiser" and that defendant acted both with "an intent to kill" and "with wanton disregard of the likelihood that death or great bodily harm would result to Officer Ebbighausen as a result of his actions."

¶ 19.   The court evaluated the circumstantial evidence regarding intent. It noted that defendant was attempting to escape law enforcement by speeding away from Baker's residence. He drove "in a very dangerous manner, on a busy highway," and was speeding at nearly twice the speed limit. Defendant also intentionally crossed into the opposite lanes of travel while knowing that police cruisers, with lights and sirens activated, were approaching in those lanes. Seeing this maneuver, Officer Ebbighausen and Officer Parker pulled their cruisers into their right-hand lane to avoid a collision and pulled further to their right when defendant continued to veer towards them. Defendant likewise had sufficient time to take evasive action but made no attempt to avoid the collision—he "did not brake, swerve, [or] attempt to avoid the collision in any manner." Instead, he continued on his path and struck Officer Ebbighausen's cruiser nearly head-on and at a high rate of speed.

¶ 20.   Assessing the charged aggravating factors, the court determined that there was insufficient evidence to prove two of the three, as set forth in 13 V.S.A. § 2311(a)(4) and (5). However, it determined that there was sufficient evidence for a jury to find that, under § 2311(a)(7), defendant knew that his victim was a law enforcement officer performing her duties.

---

[1] In addition to these findings, the trial court found that defendant suffered from mental-health issues. Roughly two weeks before the incident, defendant was hospitalized at a psychiatric ward for two days, and he did not consistently take his prescribed psychiatric medications.

4

The evidence showed that defendant "was aware that he was trying to escape from a law enforcement officer" and circumstantial evidence showed that, before crossing the centerline into the opposite lane of travel, Officer Ebbighausen's oncoming police cruiser with its blue lights and sirens activated were visible and audible to defendant. From this evidence, a jury could find that defendant understood that the cruiser "was being driven by a law enforcement officer performing her lawful duties," and he then crashed his truck directly into Officer Ebbighausen's cruiser "without taking, or attempting, any evasive actions."

¶ 21.    Having determined the evidence of guilt was great, the court assessed whether to exercise its discretion to release defendant using the factors set forth in § 7554(b). The court concluded that defendant failed to overcome the presumption that he be held without bail. It determined that holding defendant without bail was "necessary to reasonably prevent flight to avoid prosecution and for public protection." While admitting that some of the factors "cut both ways," the predominating factors were the "number of offenses, the seriousness and nature and circumstances of the offenses, and the evidence of flight to avoid prosecution." It observed that defendant was facing a charge of aggravated murder which carries the most severe penalty available—life imprisonment without the possibility of parole. The court also noted that defendant "demonstrated a great risk of flight to avoid prosecution" as reflected by his conduct which formed the basis of the alleged crimes.[2]

¶ 22.    The court concluded that defendant's proposed conditions of release did not sufficiently mitigate the risk of flight and the danger he posed to the public. Although the court acknowledged that defendant successfully resided with his sister after his initial arraignment and release, "the case is now in a very different posture." The court explained that, unlike before, defendant now faced several serious felony charges, one of which carried a sentence of life without parole. These new charges "significantly increas[ed] the risk of flight to avoid prosecution." The court expressed doubt that defendant's sister could adequately supervise defendant, especially in light of the new charges. It also noted that the sister lived in New Hampshire, making it "more difficult for law enforcement to determine whether the conditions of release are being adhered to."

II. Analysis

¶ 23.    Under 13 V.S.A. § 7553, a person may be held without bail if "charged with an offense punishable by life imprisonment" and "the evidence of guilt is great." The standard for determining whether the "evidence of guilt is great" mirrors the standard set forth in Vermont Rule of Criminal Procedure 12(d). See State v. Sawyer, 2018 VT 43, ¶ 4, 207 Vt. 636, 187 A.3d 77 (mem.). Accordingly, there are two requirements to hold a defendant without bail under § 7553: "(1) the defendant is charged with a crime carrying a potential sentence of life imprisonment, and (2) the State can present evidence that, taken in the light most favorable to the State and excluding modifying evidence, can fairly and reasonably show defendant guilty beyond a reasonable doubt." Id. (quotation omitted). Should the State satisfy those requirements, "a presumption against

---

[2] The court also added in a footnote that it would not alter its decision to hold defendant without bail even if the State had only met its burden for second-degree murder standing alone. It explained that the penalty for second-degree murder carried a potential penalty of life imprisonment, see 13 V.S.A. § 2303(a), which "would still be considered an extremely serious charge," and the court's "analysis and conclusions would not change."

5

release arises, and the burden shifts to the defendant to present evidence that persuades the court to set bail or conditions of release." State v. Vialet, 2021 VT 62, ¶ 3, 215 Vt. 648, 261 A.3d 642 (mem.). "Once that presumption arises, the court has extremely broad discretion in determining whether to hold defendant without bail or to release defendant with conditions." State v. Blaisdell, 2023 VT 62, ¶ 9, __ Vt. __, 311 A.3d 156 (mem.) (quotation omitted).

¶ 24. Our review of a decision to hold a defendant under § 7553 is for an abuse of discretion. State v. Lafayette, 2021 VT 38, ¶ 10, 214 Vt. 649, 254 A.3d 851 (mem.). In performing that review, "[w]e consider the record below . . . but independently determine[] whether the standard has been met." Id. (citation omitted) (quotation omitted).

## A. Weight of the Evidence

¶ 25. Defendant argues that the trial court erred in finding that the evidence of guilt was great for two reasons. First, he challenges the trial court's admission of two expert reports introduced by the State, both of which opined on defendant's speed when he collided with Officer Ebbighausen's cruiser. Second, he argues that there was insufficient evidence that he intentionally drove into Officer Ebbighausen's cruiser. We address each argument in turn.

### i. Admission of Expert Reports

¶ 26. Defendant challenges the admission of the report by Jason Cooper of the New York State Police Forensic Media Services (NYSP Report) and the accident reconstruction report by State Trooper Thomas Howard (Reconstruction Report). The thrust of his claim is that the reports failed to establish the reliability of the methods used to reach their conclusions. He argues that the reports were therefore inadmissible under Vermont Rule of Evidence 702.

¶ 27. Under Rule 702, expert testimony in the form of "scientific, technical, or other specialized knowledge" is admissible if it "will assist the trier of fact to . . . determine a fact in issue." Such expert testimony is permissible so long as "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." V.R.E 702. Rule 702 is "essentially identical" to its federal counterpart, and we therefore "apply the federal principles governing admissibility of expert testimony." 985 Assocs. v. Daewoo Elecs. Am., Inc., 2008 VT 14, ¶ 6, 183 Vt. 208, 945 A.2d 381 (quotation omitted).

¶ 28. Rule 702 embodies "a trilogy of United State Supreme Court cases, beginning with [Dabuert v. Merrell Dow Pharmaceuticals, Inc., 508 U.S. 579 (1993)], that expound the limits of admissibility for expert testimony and create workable standards for use by trial judges" to assess an expert's qualifications and the reliability of the methods used to reach their opinions. State v. Pratt, 2015 VT 89, ¶ 16, 200 Vt. 64, 128 A.3d 883. Daubert and its progeny provide "a flexible standard intended to keep misleading 'junk science' propagated primarily for litigation purposes out of the courtroom while simultaneously opening the door to well-reasoned but novel scientific or technical evidence." 985 Assocs., 2008 VT 14, ¶ 8.

¶ 29. The reliability of an expert's opinion depends on whether it is "sufficiently rooted in scientific knowledge." Pratt, 2015 VT 89, ¶ 17. To make that reliability assessment, a trial court may look to the four Daubert factors: (1) whether the applicable theory or technique can be

tested; (2) whether it has been subjected to peer review and publication; (3) its known or potential error rate; and (4) whether it has been generally accepted by the scientific community. State v. Streich, 163 Vt. 331, 343, 658 A.2d 38, 47 (1995) (citing Daubert, 509 U.S. at 591-94). "These factors are not exhaustive, and a trial court has broad discretion to determine, on a case-by-case basis, whether some or any of the factors are relevant in evaluating the reliability of expert evidence before it." State v. Scott, 2013 VT 103, ¶ 10, 195 Vt. 330, 88 A.3d 1173 (quotation omitted). This approach reflects the effort "to promote more liberal admission of expert evidence" while keeping intact the trial court's gatekeeping role of excluding junk science. Pratt, 2015 VT 89, ¶ 17 (quotation omitted).

¶ 30. Our review of a trial court's decision to admit expert testimony is for an abuse of discretion. 985 Assocs., 2008 VT 14, ¶ 9. Such decisions "are highly discretionary, and we will reverse only where discretion has been abused or withheld and prejudice has resulted." Griffis v. Cedar Hill Health Care Corp., 2008 VT 125, ¶ 18, 185 Vt. 74, 967 A.2d 1141. Therefore, the scope of our review is limited to "whether the judge's decision was either made for reasons clearly untenable or was unreasonable." State v. Sullivan, 2017 VT 24, ¶ 27, 204 Vt. 328, 167 A.3d 876. "Absent a clear showing of judicial error," we will affirm a trial court's determination to admit expert evidence. Id.

¶ 31. Here, the trial court properly exercised its discretion when it concluded that the NYSP Report and the Reconstruction Report were reliable and therefore admissible.[3] The NYSP Report outlines Cooper's qualifications as a forensic video analyst and details how Cooper utilized his expertise to determine defendant's speed by analyzing video evidence of defendant driving on Woodstock Avenue moments before the collision. The NYSP Report stated that, to determine defendant's speed based on the surveillance video from two businesses on Woodstock Avenue, Cooper employed reverse projection photogrammetry. According to Cooper, this methodology "is the scientific process of obtaining accurate measurements and observations from photographic and video images" by overlaying contemporary images on top of historic images. In essence, the method seeks to answer a simple mathematical question: the distance that the object traveled divided by the time to travel that distance. To solve that equation, the historical images were aligned to the contemporary scene. Cooper recreated the scene captured on video by scanning the scene with a 3D laser scanner, "a recognized scientific forensic documentation process that assists with the analysis and visualization of evidence." Having an accurate scan of the scene allowed "for measurable alignment with the calibrated video" by defining the position of the vehicle in question with known vehicles in similar positions. Cooper then detailed how he was able to confirm the refresh rate of each video to accurately determine the time it took for one frame to move on to the next. That required going to the scene and performing speed tests while using the same surveillance systems that captured defendant's truck. Cooper then provided an explanation for his analysis of each video. His analyses included a margin of error for the distance traveled by the objects between each frame. He concluded that defendant's average range of speed was between seventy-two to ninety-eight miles per hour.

---

[3] There is no dispute that the reports were relevant opinion testimony and that both Cooper and Trooper Howard were qualified to offer that testimony. See 985 Assocs., 2008 VT 14, ¶ 6 (observing that only requirement of Rule 702 is that expert is qualified to give opinion and that opinion is "both relevant and reliable").

7

¶ 32. Similarly, the Reconstruction Report sought to determine defendant's speed by recreating the incident. To do this, Trooper Howard outlined each step he performed to reach his opinion. He explained the materials and facts he consulted: he contacted witnesses, responded to the scene, reviewed evidence from the incident, and employed aerial imagery to document the scene. Using the event data recorder information recovered from Officer Ebbighausen's cruiser, Trooper Howard obtained data about the cruiser's changes in speed, changes in direction, and the margins for error inherent in the recording system. From there, Trooper Howard was able to calculate the cruiser's change in velocity both laterally and longitudinally, explaining the exact mathematical formula used and citing to academic literature as a basis for additional margins of error. He performed the same analysis for Officer Parker's vehicle. Using that information, Trooper Howard was able to calculate the impact speed of defendant's vehicle, concluding that defendant's speed was between seventy-six to eighty-two miles per hour. His method for each calculation, the reasons for using each formula, and how he reached each opinion is laid out in detail.

¶ 33. The expert opinions provided in the NYSP Report and the Reconstruction Report "do not represent the type of 'junk science' Daubert intended to thwart." Sullivan, 2017 VT 24, ¶ 28. To the contrary, the opinions of Cooper and Trooper Howard rest on methodologies that they explain in full detail, their reasons for employing those methodologies, the relevant and sufficient information they relied upon, and a breakdown of how they reached their opinions using the methodologies. As the trial court noted, the NYSP report boiled down to "a straightforward calculation" based on scientific methods that Cooper broke down in detail. The court similarly examined the Reconstruction Report, detailing the evidence Trooper Howard relied upon to use for the mathematical formulae to reach his opinion. The record shows that the methodologies were capable of being tested. Pratt, 2015 VT 89, ¶ 17. The court committed no error when it determined that the methodologies were reliable, and it was therefore well within its discretion to admit the reports.

¶ 34. Defendant appears to suggest that the reports should not have been admitted because neither Cooper nor Trooper Howard averred that their chosen methods were generally relied upon in the field of crash reconstruction. This argument fails because general acceptance of a method in an expert's field is only one of the four Daubert factors that a trial court may consider in assessing reliability. Scott, 2013 VT 103, ¶ 10. The trial court had wide latitude to determine whether the methods used were reliable, independent from any given Daubert factor. Id. ("[A] trial court has broad discretion to determine, on a case-by-case basis, whether some or any of the factors are relevant in evaluating the reliability of expert evidence." (quotation omitted)). To the extent that defendant takes issue with the methodologies employed by Cooper or Trooper Howard, his criticisms go to the weight that should be assigned to their opinions, not their admissibility. See 985 Assocs., 2008 VT 14 ("So long as scientific or technical evidence has a sound factual and methodological basis and is relevant to the issues at hand, it is within the purview of the trier of fact to assess its credibility and determine the weight to be assigned to it."). Accordingly, we can discern no abuse of discretion by the trial court in admitting the NYSP Report and the Reconstruction Report.[4]

_____

[4] It is not entirely clear to what extent the trial court relied upon the admitted expert reports to make a finding on defendant's speed. Although the court apparently relied upon the

8

¶ 35.    Defendant also claims that there was insufficient evidence from which a jury could find the requisite intent element.  We disagree.

¶ 36.    "This Court has held that to support a conviction of second degree murder[,] it is sufficient to prove an intention to kill, an intention to do great bodily harm, or wanton disregard of the likelihood that one's behavior may naturally cause death or great bodily harm."  State v. Book, 2021 VT 31, ¶ 14, 214 Vt. 644, 253 A.3d 893 (mem.) (quotation omitted).  "Intent is rarely proved by direct evidence; it must be inferred from a person's act and proved by circumstantial evidence."  Id. ¶ 16 (quotation omitted).

¶ 37.    The record amply supports the trial court's conclusion that there was enough evidence for a jury to find that defendant intended to kill or cause great bodily harm to Officer Ebbighausen or, at the very least, acted with wanton disregard that death or serious bodily injury would occur.  According to the evidence, defendant was traveling approximately sixty to seventy miles per hour on a road with a posted speed limit of thirty-five miles per hour.  He crossed over the double yellow line into the opposite lanes of traffic and drove directly into the cruiser operated by Officer Ebbighausen as she continued to veer further to her right to avoid colliding with defendant.  Before crossing that center line, defendant's vantage point gave him a clear view of Officer Ebbighausen's cruiser, and the cruiser's lights and sirens were visible and audible.  Defendant took no evasive maneuvers, despite having time to do so.  He did not attempt to brake, swerve, or slow down to avoid colliding with Officer Ebbighausen's cruiser.  Taken in the light most favorable to the State, this circumstantial evidence is more than sufficient for a jury to find that defendant had the requisite intent for second-degree murder.  Cf. Book, 2021 VT 31, ¶ 16 (holding that defendant's "evidence of intent and of the act of driving the bus towards the trooper is substantial, admissible evidence that can fairly and reasonably show defendant guilty of attempted second degree murder beyond a reasonable doubt").

¶ 38.    In addition, there is substantial evidence from which a jury could find the aggravating fact that defendant knew that the cruiser he crashed into was being operated by a law enforcement officer performing an official duty.  See 13 V.S.A. § 2311(a)(7).  The evidence shows that defendant had a clear view of Officer Ebbighausen's vehicle—with its lights and sirens activated—before crossing into her lane of travel.  Viewed in the light most favorable to the State, this evidence is sufficient for a jury to find that defendant knew the vehicle was being driven by a law enforcement officer who was performing her official duties.

¶ 39.    Defendant argues that because the trial court found there was insufficient evidence that he killed Officer Ebbighausen for the purpose of escaping law enforcement, he therefore lacked the necessary intent for second-degree murder.  This argument misunderstands the court's

_____

Reconstruction Report when it found that defendant was driving "at a high rate of speed—as high as 76 [to] 82 m.p.h.," it also credited Officer Dumas's sworn statement when it found that defendant, "before the crash, was driving on Woodstock [Avenue] in the vicinity of 60-70 m.p.h." Thus, regardless of the admissibility of the Reconstruction Report, there was other evidence from which a jury could conclude that defendant was traveling at nearly twice the posted speed limit when he collided with Officer Ebbighausen's cruiser.

decision. The court determined that there was insufficient evidence from which a jury could find that defendant crashed his vehicle into Officer Ebbighausen's cruiser for the purpose of avoiding a lawful arrest for effecting an escape from lawful custody, an alternate aggravating factor charged by the State under 13 V.S.A. § 2311(a)(5). The court reasoned that "crashing his vehicle into another vehicle, while being chased by another law enforcement officer would have the opposite effect—it would hinder any efforts at escaping or avoiding arrest." In essence, the court noted the logical inconsistency of concluding that defendant was trying to escape from lawful arrest by crashing his car into a police vehicle. But while there was insufficient evidence that defendant crashed into Officer Ebbighausen's cruiser for the purpose of escaping arrest, id., there was sufficient evidence for a jury to find that he intended to kill or greatly harm Officer Ebbighausen, id. § 2311(a)(7). The first determination did not bear on the other.

## B. Discretionary Release

¶ 40. As discussed above, the court has discretion under 13 V.S.A. § 7553 to release a defendant on conditions even if it finds that the evidence of guilt is great. Blaisdell, 2023 VT 62, ¶ 9. Defendant claims that the court abused its discretion by refusing to release him on conditions.

¶ 41. Defendant first claims that the court clearly erred in finding that his sister had "previously found it difficult to manage the defendant with a 24/7 curfew at her residence." As defendant correctly notes, his sister was willing to continue to act as one of his custodians. However, his sister also testified that acting as a Condition 4 custodian "was a lot for me," because she had to supervise defendant to ensure that he complied with every condition for his release. This included monitoring defendant's medication intake and ensuring that he complied with the 24/7 house arrest, all while maintaining a full-time job. She conceded that the difficulty of her role led to the arrangement where she and her mother "could kind of split some of the time, just because it's a lot of responsibility to take care of . . . a dependent that is not yours." This testimony supports the finding that defendant's sister had previously found it difficult to supervise defendant under the conditions of his previous release. See State v. Dubaniewicz, 2019 VT 13, ¶¶ 14, 17, 209 Vt. 490, 208 A.3d 619 (observing that factual findings are reviewed for clear error and will not be overturned if supported by the record).

¶ 42. Defendant also claims that the court gave undue weight to the nature of the charges as opposed to the other § 7554(b) factors. As already explained, a court "may look to the factors listed in 13 V.S.A. § 7554(b) to decide whether a defendant should be granted bail regardless of the presumption of incarceration." State v. Henault, 2017 VT 19, ¶ 4, 204 Vt. 628, 67 A.3d 892 (mem.). Here, the trial court consulted those factors and found that the "five very serious charges" were particularly significant. It determined that the nature of the incident "demonstrat[ed] strong evidence of flight to avoid prosecution" notwithstanding defendant's previous record of appearing for court proceedings. As the court explained, "defendant attempt[ed] to avoid prosecution for breaking into another's person's residence by intentionally fleeing from law enforcement and driving in an incredibly dangerous fashion." That conduct indicated that he was willing to go to "great lengths" to avoid prosecution. We agree that the nature of defendant's conduct was highly probative of this § 7554(b) factor as it bore directly on his willingness to flee prosecution and risk the safety of others. Blaisdell, 2023 VT 62, ¶ 12 (holding no abuse of discretion in trial court's refusal to discretionarily release defendant under § 7553 where court placed considerable weight on the "extremely serious crimes"). The court's focus on the nature and circumstances of the

charges were appropriate considerations in determining whether defendant posed a risk of flight or a danger to the public. State v. Shores, 2017 VT 37, ¶ 22, 204 Vt. 630, 168 A.3d 471 (mem.) ("The touchstones for evaluating the trial court's exercise of discretion under § 7554 are the State's interest in mitigating risk of flight and risk of danger to the public.").

¶ 43.    Finally, defendant argues that the trial court failed to articulate how the new charges impacted the viability of releasing him under the previous conditions. This argument is not supported by the record. In its decision, the court acknowledged that defendant "did well" under the previous regime when he was released under the supervision of his sister and lived with her in New Hampshire. While that arrangement was previously adequate, "the case is now in a very different posture" since defendant was "now facing a charge of [a]ggravated [m]urder and five other serious felony charges—significantly increasing the risk of flight to avoid prosecution." The court reasoned that defendant's sister had previously found it difficult to supervise defendant and that defendant would be residing with her in a different state, which would make "it much more difficult for law enforcement to determine whether the conditions of release are being adhered to." Not only did the court explain its reasoning for why the new charges militated against releasing defendant, it properly considered those changed circumstances in refusing to release him under the previous conditions. See State v. Auclair, 2020 VT 26, ¶ 9, 211 Vt. 651, 229 A.3d 1019 (mem.) (holding no abuse of discretion where trial court refused to release defendant where, although defendant remained in community during criminal investigation, "circumstances had changed after she was charged with a crime carrying a life sentence, for which the court found great evidence of guilt.").

Affirmed.


BY THE COURT:


Paul L. Reiber, Chief Justice


William D. Cohen, Associate Justice


Nancy J. Waples, Associate Justice